ColliNs, Judge,
delivered the opinion of the court:
The subject of this congressional reference case is a claim for damages resulting from the alleged breach of a contract[1] entered into by plaintiff and the Chicago Quartermaster Depot, Department of the Army (hereinafter referred to as “QM”). The House of Representatives has ashed this court to inform the Congress of the nature of plaintiff’s claim against the United States and the amount, if any, legally or equitably due to plaintiff.[2]
In March 1952, plaintiff, a Massachusetts corporation, engaged primarily in the manufacture of heating equipment, obtained an invitation for bid, issued by QM, for the manufacture of “combination intrenching tools.” This tool, a combination shovel, axe, hoe, and pick, was developed for the Army under a research and development contract by the Ames Company. It was considered as a critical war tool, to be used in the Korean conflict. The contract, pursuant to bids, was to be the first large-scale production of the redesigned version of a tool used in World War II. Plaintiff obtained a sample of the Ames tool, but bidders were warned that, because of changes, full reliance could not be placed upon the Ames design. In February 1952, plaintiff had entered into a contract with one Harry K. Tucker whereby he was to assist plaintiff in acquiring new business. It was through the efforts of Tucker that plaintiff received the invitation to bid.
Plaintiff submitted a bid which turned out to be the low one. Defendant was concerned about the adequacy of plaintiff’s bid and its capacity, particularly financial, to handle *692 the contract. After two preaward conferences in May 1952, the contract was awarded to plaintiff. Plaintiff was to manufacture 1,067,000' of these intrenching tools at the unit price of $1.80. The average of all 16 bids for this contract was $2.61 per item; the Ames Company, which had produced the first model (which was not wholly satisfactory), bid $2.27. The delivery schedule required an initial shipment of 50,000 units by October 31, 1952; deliveries were to be completed by July 31,1953.
Under plaintiff’s plan, the manufacture of the various components would be performed by subcontractors with plaintiff doing the assembling and packing. Accordingly, in June 1952, plaintiff awarded to Northern Handle Mills, Inc. (hereinafter referred to as “Northern”), a subcontract for production of the handles. Plaintiff ordered the metal components, i.e., blades, picks, hinges, and sockets, from Meriden Industries Company (hereinafter referred to as “Meriden”). Plaintiff supplied the subcontractors with the Government drawings and specifications, but did not send any detailed Instructions. Northern, in July 1952, expressed concern to plaintiff that the broad tolerances of the specifications might lead to difficulty with regard to the fitting of sockets and handles.
On August 4, 1952, the Reconstruction Finance Corporation (hereinafter referred to as “RFC”) authorized a loan of $500,000 to plaintiff. Previously, plaintiff had obtained another RFC loan. Both RFC loans were secured by a mortgage on plaintiff’s property, and, as additional security for the second loan, RFC took an assignment of the proceeds of the intrenching tool contract. Under the assignment, the Army would pay RFC for shipments received from plaintiff and, subject to certain conditions, RFC would release the funds to plaintiff.
As of October 31, 1952, no intrenching tools had been delivered, since a steel strike had made it impossible for Meri-den to obtain needed raw materials.
In November 1952, plaintiff submitted to the contracting officer preproduction samples of the tool. The samples were tested by the Quartermaster Research and Development *693 Laboratory at Jeffersonville, Indiana (hereinafter referred to as “B & D”). Numerous deficiencies (e.y., failure to pass strength tests) were discovered and the samples were not approved. On December 29, 1952, plaintiff delivered to the contracting officer a second set of samples and, at the same time, requested permission to be present at the B & D laboratory during the tests. (Subsequently, plaintiff’s request was denied.) In January 1953, plaintiff was advised that the second samples were also defective, but that it would not be necessary to submit further preproduction samples. Within a short time, manufacture of the components, other than the socket, began.
In February 1953, during the first stages of production, plaintiff discovered that the dimensions contained in the Government drawings were such that, at one point, there would be a %6-inch gap between the hinge and the blade. On February 25, 1953, plaintiff informed the contracting officer of this matter, but plaintiff received no immediate instructions.
The contracting officer, on February 27,1953, wrote plaintiff that the delivery schedule wag being extended by 154 days. This extension was based upon the excusable delay resulting from the steel strike. Still, plaintiff was unable to meet the delivery schedule; one cause of plaintiff’s inability was the fact that Meriden failed to ship equal or nearly equal numbers of the four components. Such unbalanced deliveries from Meriden were to be a recurring problem. Furthermore, a large percentage of the tools which plaintiff did complete failed to pass inspection.
In late April 1953, the QM Inspection Division determined that metal-to-metal contact of blade and hinge was required. Plaintiff sought to achieve such contact by applying pressure to the rivet which joined the two parts. On May 27, 1953, three officers of QM visited plaintiff’s plant. At that time, plaintiff discussed with them the following problems which plaintiff attributed to errors in the drawings: the metal-to-metal contact of hinge and blade; the position of the pick when closed; and interference of the pick with the blade during closing. Plaintiff agreed to submit the entire matter in *694 writing for transmission to R & D. Also, plaintiff’s officials asked permission to go to R & D.
On June 24, 1953, plaintiff submitted its letter regarding the various problems. On July 14,1953, pursuant to permission granted by QM, three representatives of plaintiff went to the R & I) laboratory for discussion of the errors in the drawings and specifications.
■Subsequently, plaintiff prepared a list of 24 suggested changes. Representatives of plaintiff and defendant discussed the proposals at a conference on August 21,1953. Ultimately, defendant agreed to incorporate in a formal change order 20 of plaintiff’s suggestions, including (1) correction of the drawings and (2) reduction in the stringency of certain tests. With regard to the remaining four proposals, the contracting officer informed plaintiff that inclusion in the change order was unnecessary, but that the Government would not object if plaintiff used the dimensions suggested by these proposals. On September 21, 1953, the parties entered into Supplemental Agreement No. 2 which effected the changes, increased the contract price by 11.341 cents per item, and extended the delivery schedule. Plaintiff, having sought a 36-cent per item increase, considered the amount of the price increase to be too low and, accordingly, initiated an appeal under the disputes clause. However, plaintiff did not pursue the appeal.
Meanwhile, on September 8, 1953, because of plaintiff’s inability to meet its indebtedness to Meriden, the latter company had halted the production of the metal parts. This resulted in the stoppage of production of the intrenching tools until February 1954, when Meriden resumed shipping the components.
As of January 31, 1954, plaintiff was seriously delinquent on its delivery schedule. To avoid being held in default and to obtain further revision of the delivery schedule, plaintiff offered to supply the remaining tools at a slightly reduced unit price. Defendant accepted plaintiff’s offer and a new supplemental agreement was executed on February 17,1954.
After the resumption of production, there was a considerable decrease in the rate of rejections. However, plaintiff’s financial difficulties continued. Plaintiff was still *695 unable to make deliveries as required by the contract. In June 1954, the contracting officer denied plaintiff’s request for further extension of the delivery schedule, pointing out that inability to secure adequate financing did not constitute an excusable cause for delay.
On August 13, 1954, because of plaintiff’s failure to make deliveries as required, the contracting officer reduced the number of tools to be manufactured. Plaintiff appealed this partial termination to the Secretary of the Army. ■
On January 15, 1955, when the existing delivery schedule expired, plaintiff was delinquent to the extent of 412,000 tools. On February 10, 1955, the contracting officer issued a notice of default which directed plaintiff to demonstrate its ability to make substantial deliveries. At plaintiff’s request, a conference was held on February 24, 1955, during which plaintiff made a proposal for continuation of the contract. Under the suggested plan, (1) plaintiff would withdraw its appeal from the partial termination; (2) plaintiff would forego any claims it had, or might have, based upon the prior performance of the contract; (3) the unit price would be reduced; and (4) a new delivery schedule would be effected. In March, the parties reached an agreement which embodied plaintiff’s proposal. Accordingly, on March 17, 1955, plaintiff executed a complete release which, inter alia, expressly discharged the Government from any liability to plaintiff based upon discrepancies in the contract or the specifications.
In April 1955, the maturity date of the second RFC loan was, for the fifth time, extended. Still, plaintiff experienced financial difficulty and was unable to pay its subcontractors. Consequently, after July 1955, no further deliveries were made under the contract. Formal termination of the contract for default was effected as of February 4,1957.[3] Plaintiff’s appeal to the Armed Services Board of Contract Appeals was dismissed, the Board holding that it had no equity jurisdiction to reform the release which plaintiff had given.
On March 8,1957, the Government obtained in the United States District Court for the District of Massachusetts a *696 judgment of foreclosure of the mortgages given by plaintiff, to secure the NFC loans. The sale of plaintiff’s property resulted in a substantial deficit. As of October 24,1958, the unpaid balance was $156,578.03.
The first question to be considered is whether plaintiff has a valid “legal or equitable claim” within the normal meaning of those terms. That is, does plaintiff have a claim which could be successfully pursued in a court of law or equity ?
Plaintiff contends that the acts and omissions of defendant with regard to the intrenching tool contract resulted in the destruction of plaintiff’s financial condition. According to plaintiff, the initial source of difficulty was the furnishing by the Government of faulty drawings and specifications. Plaintiff argues that the erroneous provisions of the contract, coupled with defendant’s failure to make timely corrections, caused the large number of rejections. Finally, plaintiff’s financial distress and inability to perform were consequences of the fact that, to the extent of the rejections, no payments were forthcoming.
As indicated in finding 128, m/m, it is reasonable to attribute to the defective drawings and specifications a large percentage of the rejected completed tools. This court is unable to accept the contentions of defendant that the drawings and specifications contained no errors and that the sole cause of such problems as the fit of the hinge and blade was improper engineering by plaintiff. Despite the errors and delays on the part of defendant, it does not necessarily follow that plaintiff has a valid legal claim. Consideration must be given to defendant’s assertion that the Government has been released from any liability stemming from defects in the contract provisions.
The express terms of the release demonstrate the validity of the Government’s contention. The release states (in part) :
Harvet-Whipple, INC., does hereby, * * * release and forever discharge the Uotted States * * * of and from all * * * causes of action, * * * damages, claims and demands whatsoever in law or equity or under administrative procedures which * * * the said Harvet-Whipple, lire., ever had, now has or may have for or by reason of any matter, * * * arising under and by virtue *697 of * * * [tbe intrenching tool contracts] * * * from tbe beginning of tbe world to the date of these presents, it being the intention * * * of the parties that this release * * * shall apply to but is not limited to (a) any difficulties, conflicts, ambiguities, inconsistencies, discrepancies, or impossibilities which may have been or may be contained in the * * * [contracts] and any specifications referenced therein, (b) any upward adjustment in price under the terms and conditions of Supplemental Agreement No. 2 * * * in excess of $0.11341 per unit and (c) the Notices of Partial Termination for Default, dated 13 August 1954, * * *.
Therefore, assuming the release to be valid, no legal liability of defendant can be predicated upon the defects in the drawings and specifications. Furthermore, the release extends to all other claims of plaintiff, relating to the performance of the intrenching tool contract, which arose prior to March 17, 1955, the date when the release was executed.
Approximately 4 months elapsed between the date of the release and July 29, 1955, the date of the final shipment by plaintiff. Plaintiff did not stress or argue that any of defendant’s actions during that period could be considered as breach of contract. Nor can liability be based upon defendant’s conduct during the interval from July 29, 1955, to February 4, 1957, when formal termination was completed.[4] The conclusion follows that any possible claims of plaintiff were included within the terms of the release. Plaintiff, however, seeks to avoid the effects of the release by asserting that defendant obtained the release by means of duress.
Examination of the circumstances which gave rise to execution of the release compels the conclusion that there was no coercion or duress on the part of the Government. Of prune significance is the fact that the proposal whereby plaintiff would forego its claims originated with plaintiff, not with the Government. On January 25, 1955, frior to *698 issuance of the notice of default, representatives of plaintiff went to QM for a conference. Plaintiff included in a proposal which was designed to achieve an extension of the delivery dates the waiving of all claims against the Government. Plaintiff’s plan (which involved the taking over of plaintiff by a certain group of businessmen) did not materialize. Still, this court is confronted with the fact that the idea of releasing the Government was initiated by plaintiff.
Also, at the February 24, 1955, meeting (held subsequent to the default notice), it was plaintiff who voluntarily proposed, inter alia, that plaintiff forego its claims and covenant not to sue. Plaintiff’s offer furnished the basis for the March 9, 1955, “Memorandum of Understanding” which in turn was incorporated in the supplemental agreement of March 17, 1955. One aspect of the latter agreement was the execution by plaintiff of the release. It is important to note that the purpose of plaintiff’s proposal was achieved, i.e., the contract was not terminated for default, and plaintiff secured an extension and revision of the delivery schedule.
When the contract was executed, plaintiff’s business had declined and its financial picture was weakened. This increased during the performance of the contract until, at the time of execution of the release, plaintiff was in serious financial difficulty. However, this is not a ground for holding the release invalid. Cf. Alloy Products Corp. v. United States, 157 Ct. Cl. 376, 381, 302 F. 2d 528 (1962).[5] Another underlying circumstance was the fact that the contracting officer had served upon plaintiff a notice of default. In view of plaintiff’s serious delinquency at the time, issuance of the default' notice was proper and its existence did not affect the validity of the release.
To summarize, this court holds that the release (1) was not obtained through duress, (2) was valid and binding, and (3) bars any legal or equitable (in the juridical sense) claims *699 which, plaintiff might have. Cf. J. G. Watts Constr. Co. v. United States, 161 Ct. Cl. 801 (1963) (release); Cannon Constr. Co. v. United States, 162 Ct. Cl. 94, 319 F. 2d 193 (1963) (accord and satisfaction).
A second issue in this congressional reference case is whether plaintiff has an “equitable” claim within the broad, moral concept as enunciated in Burkhardt v. United States, 113 Ct. Cl. 658, 667, 84 F. Supp. 553 (1949). Despite our conclusion that the release bars any claims of the type cognizable in a court of law or equity, it does not automatically follow that the same result applies to “equitable” claims in the broad sense. Rocky River Co. v. United States, ante, p. 203. See also Drake American Corp. v. United States, 168 Ct. Cl. 318 (1964).
In determining the effect of a release upon “equitable” claims, this court has gone beyond the traditional grounds for avoiding such an instrument {i.e., duress, mutual mistake, etc.) and has looked into the circumstances which gave rise to the release. For example, in a recent congressional reference case, Rocky River Co. v. United States, supra, this court held that the plaintiffs had a valid “equitable” claim, even though any legal claims were barred by general releases. Our decision was based upon a finding that the releases did not contemplate disposition of the matter in question (damages resulting from the defendant’s failure to remove all unexploded shells from the plaintiffs’ lands). That is, when the releases were executed, the Government and the plaintiffs all had believed that the former would successfully clear the latter’s lands of unexploded shells. Thus, the case was distinguished from Hellander v. United States, 147 Ct. Cl. 550, 178 F. Supp. 932 (1959), where, at the time of execution of a general release, both parties were fully aware of the claim which the plaintiff subsequently attempted to assert. In Hollander, also a congressional reference action, the existence of the release was one of the alternative grounds for a decision adverse to the plaintiff.
However, even the more flexible rule exemplified by Rocky River Co., supra, does not require, in the case at bar, that the release be set aside. As indicated in our discussion of plain *700 tiff’s “legal” claim, the release was not forced upon plaintiff by the Government. On the contrary, the granting of a release was part of a plan which plaintiff itself had originated. At the time when plaintiff executed the release and discharged the Government, plaintiff was fully aware of its situation and all matters upon which its present claim is based. Plaintiff’s goal in entering into the supplemental agreement, one part of which was execution of the release, was to avoid termination for default and to obtain from the Government a revision and an extension of the delivery schedule. Defendant did grant the changes requested by plaintiff, and, although plaintiff’s hope of completing performance of the contract was not realized, the fact remains that plaintiff received the “bargained-for” consideration. Under these circumstances, this court cannot escape the conclusion that the release bars plaintiff’s “equitable” claims, in the nonjuridical sense, as well as those cognizable in a court of law or equity.[6]
Even in addition to the circumstances of the release, there are factors which support our conclusion that plaintiff has no “equitable” claim. As defendant points out, the RFC granted, at plaintiff’s request, five extensions of the second loan. The cumulative effect of these extensions was to change the maturity date from September 30, 1953, to December 31, 1955. Also, with regard to the intrenching tool contract, numerous extensions of the delivery schedule were granted. Thus, the record does not support plaintiff’s contention that the attitude of the Government toward plaintiff' was one of harassment and noncooperation. As already *701 indicated, two major sources of plaintiff’s difficulty were plaintiff’s own financial position (which had begun to decline prior to the. intrenching tool contract) and plaintiff’s reliance upon Meriden as the major subcontractor. Responsibility for these two factors cannot be’ placed upon the Government.
In view of our conclusion that plaintiff has no claim, legal or equitable, it is unnecessary to discuss the affirmative defense pertaining to violation by plaintiff of the covenant against contingent fees.[7] Another affirmative defense stems from the RFC loans and defendant asserts the unpaid balance of the loans as a counterclaim.
The record before the court shows that the defendant, knowing that plaintiff corporation was (and still is) nonfunc-tioning as a business enterprise or going concern and insolvent, elected to proceed against the personal guarantors of the notes to the RFC and has obtained a judgment in the United States District Court for the District of Massachusetts against them.[8] Since a deficiency judgment against Harvey-Whipple, Inc., would be uncollectible (unless relief were given by Congress), it being insolvent, and since this court recommends no relief for plaintiff, the court, although it has the power to do so, declines to enter judgment for de *702 fendant against the plaintiff corporation on the defendant’s counterclaim, which is dismissed without prejudice. Should the defendant wish to pursue the matter further, it may do so in the District Court in Massachusetts where, the foreclosure proceedings were instituted and where the action against the guarantors has been taken.
This opinion, concluding that plaintiff has no claim, legal or equitable, against the United States, and the findings of fact incorporated infra, will be certified by the Clerk to Congress pursuant to House Resolution 487, 85th Congress, 2d Session.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Saul Richard Gamer, and the briefs and arguments of counsel, makes findings of fact as follows :
1. Plaintiff is a corporation organized under the laws of Massachusetts. In 1952, when it entered into the contracts with defendant herein involved, and for many years prior thereto, it was primarily engaged, at Springfield, Massachusetts, in the business of manufacturing and distributing heating equipment and related articles. Plaintiff was incorporated in 1925, succeeding the original business which was commenced in 1923 by Walter O. Harvey and Ray G. Whipple.
' 2. In 1949, plaintiff had obtained a loan from the Reconstruction Finance Corporation (hereinafter referred to as RFC) in the amount of $325,000. The loan was repayable at the rate of $60,000 annually in monthly installments of $5,000 each beginning October 6, 1949, and on the 6th day of each month thereafter to February 6, 1955. These funds were used to finance certain Government contracts involving the manufacturing of products unrelated to plaintiff’s heating equipment business. The loan was secured by a first mortgage covering all of plaintiff’s fixed assets, including land, buildings, machinery, and equipment.
3. (a) The year 1951 was not a profitable one for plaintiff. Its total sales (both wholesale and retail) fell to approximately $1,915,000 from the previous year’s $2,800,000. It suffered a loss of approximately $27,000 as against a profit *703 (before taxes) of approximately $43,000 the previous year. In this regard, plaintiff was following an industry trend. The bulk of plaintiff’s sales (over $1,825,000) was to the civilian market. A small portion went to the Government. Nevertheless, as of December 31, 1951, plaintiff’s net worth was $579,623.49, and its working capital (current assets minus current liabilities) was approximately $250,000. However, its current asset ratio (ratio of current assets to current liabilities) was $1.53 to $1, i.e., it had $1.53 current assets for each $1 of current liabilities. This was somewhat low. The normal standard for a sound business is generally considered to be a current asset ratio of $2 for each dollar of current liability. Further, as of that date, its cash position was poor, constituting only approximately $18,500, and thus causing it to be in a relatively nonliquid position.
Plaintiff had embarked on a development program for new heating equipment. But, despite large expenditures, the new products were not yet ready to be marketed. Plaintiff felt that it then had the capacity and ability to produce other products simultaneously with its heating equipment items, and commenced to seek business of other types.
During the year the EFC authorized a reduction in the total annual payments on its loan to $30,000 (from $60,000) payable at the rate of $5,000 per month for the months of July through December of each year.
(b) Previous to 1951, plaintiff had, except for the year 1948, earned a profit every year since 1942. The following chart shows plaintiff’s gross sales and net income for the years 1942-1950:

*704 4. In February 1952 plaintiff first learned of one Harry K. Tucker of Asbury Park, New Jersey, who plaintiff believed could obtain additional business for it. On February 15, 1952, plaintiff entered into a contract with Tucker trader which plaintiff agreed to pay Tucker “a minimum salary of $100.00 per week during the life of this contract, starting immediately, for the services of you [Tucker] and/or your organization in making contact between our company and prospective buyers.” Such services included “the acquainting of buyers with our company and its facilities, soliciting and obtaining prints, specifications and bid forms from both commercial firms and various United States Government Departments * * Also included in the services Tucker was to perform were (a) “Obtaining (when and if possible) opportunities to quote, invitations to bid, blueprints, specifications, samples (if available), etc.”; (b) the furnishing of his “preliminary price breakdown with shop production method suggestions”; (c) assistance, upon plaintiff’s written request, “in the collection of invoices”; and (d) assistance, upon plaintiff’s request, in the location of “materials and other items in the production of business thru you.”
The contract further provided:
2. Your weekly salary shall increase as, when and if you get us business based on the following schedule:
Your weekly salary Percentage for comparison only Equivalent to_ 5% 3% Our weekly gross sales* Up to $20,000-Over $20,001...
3. Salary increases will start 30 days after the initial delivery date (as provided by all original or repeat orders or contracts accepted by us hereinunder) and will continue for the life thereof. However, in the event of fires, earthquakes, floods, strikes, lockouts, or acts of God, your salary (at our option) can be temporarily suspended for the period so affected, otherwise, your salary shall be due and payable weekly and shall be mailed to you, your heirs, or assigns, on Friday of each week. All *705 minimum salaries paid prior to your effecting sales for us will be deducted from any salary increases due you (over and above your minimum salary) until all minimum salaries have been liquidated. (All payments subject to payroll withholding tax, W-4 Form.)
4. Orders (or contracts) cancelled for reasons other than our failure to perform ('but not otherwise) shall automatically cancel any salary increase due you from such orders (or contracts) so involved.
It is understood and agreed by us that you have the right to sell, assign, transfer or set over unto anyone of your choice, all or any part of your right, title and interest herein, in which event you hereby have our acceptance thereof, upon your written notice to us.
It is further understood that you will request a Dun & Bradstreet Deport on us, and in the event you find this report disfavorable or of such a nature that the ordinary prudent businessman would not conduct ordinary business or trade with any individual or firm having such a report, in that event you shall have the right to terminate this agreement in its entirety upon one week’s written notice of termination.
# * # ❖ #
6. In the event your services do not develop business sufficient to maintain your minimum salary, we reserve the right to cancel this contract (as provided for in Paragraph #17 herein) in which event no claim for refunds shall be made by us against you nor you against us for further payments.
7. Unless specifically agreed to in writing by us, you are to receive no commissions, percentage, brokerage or contingent fee of any kind or nature at any time beyond the salary stipulated in Paragraphs 1, 2 and 3 hereof.
8. All business from you is subject to our acceptance or rejection and our decision will be final. In all cases we shall ship, bill and collect direct from the customer.
9. We understand and agree that your services for us in soliciting and obtaining prints, specifications and Bid Forms from various United States Government Departments will be strictly of a routine and standard procedure.
10. We also confirm your statement to us that you have no special connections of any kind with any Government Departments, Official or individual.
‡ ‡ ‡
13. We do not relinquish any right to sell to whomever we may desire as you have not been given any special *706 or exclusive territory by us. However, unless we immediately notify you to the contrary, any account you submit to us shall be regarded as your account and your compensation therefrom shall continue so long as these accounts continue with us, the validity of this agreement notwithstanding.
14. We agree that you represent other persons and firms having the same and dissimilar lines of business and that you will continue to do so.
‡ ‡ $ $
16. You are hereby authorized to act as our Bona Fide Sales Agent (on a part time weekly salary basis) without limitations as to your territory or source of business. You are not authorized to bind us unless expressly authorized to do so in writing. We will supply you with an Employees Identification Form.
17. This agreement shall continue for the initial term of 6 months from this date and so on from 6 months to 6 months unless thirty (30) days’ notice in writing is given one to the other of intent to cancel this agreement prior to the expiration of the initial or any subsequent term hereof.
‡ ‡ $
5. The first Invitation to Bid which came to plaintiff through Tucker was one for a so-called Aircraft Maintenance Platform issued by Headquarters, Air Materiel Command, Wright-Patterson Air Force Base, Dayton, Ohio. However, plaintiff’s bid of March 3, 1952, was rejected.
On some subsequent invitations which Tucker furnished, plaintiff decided not to submit a bid.
6. On March 4, 1952, an Internal Revenue Service form (W-4) entitled “Employee’s Withholding Exemption Certificate (Collection of Income Tax at Source on Wages),” was executed with respect to Tucker. This permitted plaintiff to make the necessary payroll deductions. Tucker transmitted this form to plaintiff by letter of March 4,1952, which also stated:
We want to again repeat that we make no claims of any so-called “inside connections” or “influential acquaintances”. Our position is the same as yours, since all individuals and corporations are on an equal footing as to their rights and privileges before all Government Bureaus and Departments. What we can and did offer you is experience and intelligently directed effort. As a *707 measure of protection to your company, it should be understood that you give us no other authority, nor are we under any further obligation other than obtaining business for you.
Please understand that you cannot expect immediate results. It will take me time to assimilate the type of work that is best suited for your facilities. Further, we have confidence in the knowledge that you will not make “snap” acceptances or acceptances which are not based on scrutinous and careful consideration.
7. On March 20, 1952, the Chicago Quartermaster Depot, Department of the Army (hereinafter sometimes referred to as QM) issued an Invitation for Bids for the famishing of 1,067,000 units of a “Combination Intrenching Tool.” This tool was a combination folding pick and shovel. The shovel blade was designed to be strong enough so that its edge could be used as an axe. Thus, the tool could perform as a shovel, a pick, a hoe, and an axe. It was carried by combat soldiers for use, among other things, in digging foxholes and trenches, positioning tent pins, cutting brush and roots, and for similar purposes. At this time, the Korean war was in progress and the item was regarded as a critical war tool.
This Invitation to Bid was also obtained by Tucker who, on March 27,1952, advised plaintiff thereof and then subsequently turned over to plaintiff the invitation itself.
8. Folding shovels had been used extensively by our combat soldiers during World War II, when over 18,500,000 were produced. However, it was then necessary for some combat men to carry shovels, others axes, and others picks, with some in combat squads not being provided with any tool. It was then decided to develop a combination .tool which would be available to each combat soldier. The Ames Company, which had been in the business of manufacturing shovels for many years, and which had provided approximately 9% million of the World War II type of folding shovel, produced the first model combination tool. After tests disclosed certain deficiencies in this model, the tool was redesigned and, in 1950, a research and development contract was let to the Ames Company to produce 10,000 units of this improved model. This contract was completed in 1951, with the tools *708 then being distributed to various operating elements of the Army for thorough service tests. These tests indicated the need for still further improvements. Thereupon, the Research and Development Division of the Army’s Quartermaster Depot (hereinafter sometimes referred to as R & D), in collaboration with Ames, made further changes in the design of the tool. These changes were intended to result in an improved model as well as one that would be simpler to manufacture under a large scale production contract.
The combination tool which was the subject of the March 20, 1952, Invitation for Bids was this redesigned tool, with the contract to result therefrom 'being the first large scale production thereof. Bidders were warned not to rely on the previous design of the tools produced under the Ames research and development contract because of the changes that subsequently had been made. However, samples of such Ames tool were made available to bidders as an indication of what a combination intrenching tool was generally like, and plaintiff did obtain such a sample.
9. On April 8,1952, plaintiff submitted a bid of $1.80 per unit, provided the bid was accepted within 80 calendar days from the date of the opening. The bids were opened on April 9, 1952. In all, sixteen companies submitted • bids. Plaintiff was the low bidder. The two next low bids were $1.86 and $2.0475 per unit. The Ames bid was $2.27. The average of all the bids was $2.61.
Some employees of R & D were disappointed that a company unknown to them and with no previous experience in the manufacture of this type of implement was the successful bidder. However, this was not a research and development contract, such as had been the Ames contract, and that Division, therefore, had no direct responsibility for the administration of this proposed production contract. Instead, the Procurement Division of QM was vested with such responsibility.
10. On April 16, 1952, a representative of QM inspected plaintiff’s plant and discussed the proposed production with plaintiff’s officials.
Plaintiff itself was not equipped to manufacture an implement such as the intrenching tool. It was plaintiff’s plan *709 to subcontract the manufacture of all the component parts. Plaintiff would then assemble, paint, pack and ship (50 percent domestic and 50 percent export) the completed tools. Plaintiff proposed to establish an automatic line for the assembly operation and the spray paint facilities.
11. On May 6, 1952, a QM contracting officer telephoned plaintiff’s president (Whipple) and requested an extension of time of 15 days in which further to consider plaintiff’s bid. Such extension was granted. The QM official also requested financial data concerning plaintiff and certain information concerning plaintiff’s proposed subcontractors, all of which plaintiff submitted.
12. On May 19, 1952, plaintiff, being in need of working capital, entered into a loan agreement with the Springfield National Bank of Springfield, Mass., under which the bank agreed to advance funds to plaintiff up to 80 percent of the value of assigned accounts receivable. This was the only collateral of a substantial nature which plaintiff could furnish because, as hereinabove set forth, all of its plant and property had already been mortgaged to the RFC.
13. The QM officials in charge of this procurement became concerned about whether plaintiff could successfully produce the tool at what they considered to be a rather low price. They decided to hold a “preaward” conference with plaintiff’s officials on May 20, 1952, the day prior to the expiration of plaintiff’s bid, to explore the matter. Plaintiff’s officials were requested to present a cost breakdown at the conference. Such a conference was held on that day at the QM offices with plaintiff’s president and plaintiff’s director of purchases and vice-president (Shaw). Defendant’s officials stated that plaintiff was the low bidder, but that defendant wished to make certain that plaintiff understood the specification requirements and that plaintiff had not made any errors in the computation of its bid, since defendant’s officials considered the bid to be quite low. Plaintiff’s estimated costs and its proposed method of operation were reviewed. Among other things, an official of defendant inquired whether it might not be better for plaintiff to manufacture some of the component parts itself, because each subcontractor would expect to make a profit on its own operation.
*710 Plaintiff’s officials inquired whether the tool and the specifications had been proved and fully tested, and defendant’s officials stated that plaintiff could assume that this was the situation.
As a result of the discussion, it was agreed that plaintiff’s bid would remain open until plaintiff could reconsider it and decide whether it wished to undertake the contract.
■ 14. The breakdown of its bid price which plaintiff presented to defendant at the preaward conference was as follows:
Cost Analysis of Intbenching Tool
Labor_ 0. 13
Material Direct Supplies:
Paint_ 0. 027
Packing supplies_ . 022
- . 049
Purchased Parts — Subcontractors:
Shovel, pick, etc_ .80
Handle_ . 22
Handle unit_ . 1063
Special rivets_ . 007
Hinge pins_ . 0158
Washer_ . 0186
Packing box_ . 073
- 1. 2407
Special perishable equipment_ . 02
Rearrangement of facilities_ . 01
Direct Factory overhead — 1.323% of direct labor_ . 172
- . 202
1. 6217
Administrative Expenses_ . 0486
Total Costs_ 1. 6703
Profit before'taxes, 7.8%_ . 1297
Ceiling Price_ 1. 8000
Plaintiff had calculated these estimates in conjunction with the Tucker organization.
15. Plaintiff’s officials thereupon reviewed the entire matter and concluded that, on the basis of all the information they had and furnished to them by defendant’s officials, their bid was ample to permit a successful completion of the con *711 tract'. They so informed the QM officials on May 26, 1952. Thereupon defendant decided to accept plaintiff’s bid for the manufacture of the 1,067,000 tools at $1.80 per unit. ■ At the time, plaintiff was in need of additional business and was anxious to obtain this award.
16. For administrative purposes relating to. appropriations, it was necessary to divide the procurement into three contracts. Such three contracts, dated as of May 26, 1952, providing for the manufacture and delivery of 1,067,000 intrenching tools for an aggregate price of $1,920,600, were entered into by plaintiff and defendant. The contracts were as follows:
(a) Contract No. DA 11-009-QM-18702 provided for the manufacture of 500,000 tools, at a total price of $900,000. The delivery schedule required an initial delivery of 50,000 units during the month of November 1952 and monthly deliveries of 60,000 units thereafter except in the final month, in which 30,000 were to be delivered, all deliveries to be completed by July 31,1953.
(b) Contract DA 11-009-QM-18703 provided for 50,000 tools at a total contract price of $90,000. The delivery schedule required the shipment of all 50,000 to be made not later than October 31,1952.
(c) Contract No. DA 11-009-QM-18704 provided for 517,000 tools at a total price of $930,600. The delivery schedule required an initial delivery of 50,000 units during the month of November 1952 and 65,000 per month thereafter, except in the final month, in which 12,000 were to be delivered, all deliveries to be completed by July 31, 1953.
Thus, if plaintiff began making deliveries commencing around October 1, 1952, on contract 18703, in order to complete the 50,000 units to be delivered by the end of that month on that contract, plaintiff would have approximately 4 months to prepare for the commencement of production.
Each contract contained the following provision:
20. Covenant Against Contingent Fees
The Contractor warrants that no person or selling agency has been employed or retained to solicit or secure this contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, *712 excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Contractor for the purpose of securing business. For breach or violation of this warranty the Government shall have the right to annul this contract without liability or in its discretion to deduct from the contract price or consideration the full amount of such commission, percentage, brokerage, or contingent fee.
17. By letter of May 26,1952, the same date as that of the three contracts, plaintiff requested Tucker to reduce his compensation with respect to the intrenching tools from $0,054 each 3 percent, as set forth in Tucker’s contract) to $0.02 each. However, by letter of June 5, 1952, Tucker rejected the request and stated he would “expect compensation based on $.054 on each of the 1,067,000 units, a total of $57,618.” Tucker stated that current cost estimates, as a result of the “very sizable amount of time and expense” spent by the Tucker organization, were now lower than those originally estimated. The letter went on to state:
Previous estimates left $.184 each for profit and overhead. Present confirmed estimates leave $.36 each for profit and overhead, or a total in excess of $375,000.00.
If prices had run the way it looked when you were in Chicago, most certainly I would have been the first to volunteer a cut on my part, but they haven’t, and since much of the saving is a direct result of our further efforts in your behalf, I doubt very much if you would ask us to take any cut. I, frankly, think you are too fair for that sort of practice.
Tucker also advised that he had assigned 25 percent of his interest “in the above deal” to a third party.
18. On June 2, 1952, a steel strike occurred which prevented the obtaining of the steel required for the performance of the contracts.
19. Plaintiff’s major subcontractor was Meriden Industries Company (hereinafter sometimes referred to as Meri-den) of Hamden, Connecticut, a company which had previously manufactured for plaintiff a component part of plaintiff’s oil burners. Meriden first submitted a formal quotation to plaintiff in early June 1952. This quotation was for the manufacture of four important component parts of *713 the tool — the blade, the pick, the hinge (which connected the blade to the pick and the socket), and the socket (in which the wooden handle was to be inserted).
The contract specifications provided that inspection would be made by defendant to determine plaintiff’s compliance with the specifications. Such inspections were to be conducted pursuant to instructions issued by the QM Inspection Division to the inspectors who were to be stationed at plaintiff’s plant, and which instructions were incorporated in a document labeled “Standard Inspection Procedures,” sometimes referred to as the SIP. Plaintiff received a copy of this document on June 18,1952.
20. On June 18,1952, plaintiff placed an order with Northern Handle Mills, Inc. (sometimes hereinafter referred to as Northern) for 1,067,000 hickory handles. An order for 1,067,000 handle nuts was placed on June 20,1952.
21. By letter of June 20, 1952, to Tucker, plaintiff stated, in part:
* * * [V] arious figures which you have submitted cannot be substantiated and they are completely at variance with the facts as exist at this date. I am confident they will not be favorably altered in the future.
Time is running short. Subcontracts must be placed immediately, so the chances of substantiating the figures you have submitted are certainly remote, to say the least.
In brief, there has been very, very little change from the figures which we were working on in Chicago. Of particular concern to us is the stampings, and, very frankly, it is a serious problem.
We submitted prices in Chicago only after phoning you from that point and getting your approval to reduce your commission to .02 per tool from the original of .054. That you agreed to do and only after receiving your approval of this change did we affirm the price. The figures as now exist do not justify any change from what was agreed upon and, speaking frankly, until such time as we can see an improvement beyond that which is before us at the present writing, we cannot agree that the books can be considered closed on the subject.
22. On June 25,1952, plaintiff issued an order to Meriden to manufacture and deliver, in accordance with the drawings and specifications which were part of plaintiff’s contract, *714 583,500 units of picks, sockets, hinges, and blades at a total price of $0.70 for each set of the four components. The order called for delivery of 36,000 of each component by September 25, 1952, 27,500 by October 25, 1952, and, thereafter, approximately 60,000 monthly, with final delivery to be made June 25,1953.
In issuing its purchase orders to Meriden and Northern, plaintiff merely supplied them with the Government specifications and drawings which were attached to and made a part of defendant’s contracts. It did not supply any subcontractor, including Meriden, with any specific instructions or detailed shop drawings for any component part which plaintiff would ultimately assemble into a completed tool. The specifications permitted a yS2-inoh. tolerance in the manufacture of the component parts, which is recognized in manufacturing operations of this kind to be a liberal tolerance. Plaintiff gave no instructions to any subcontractor, including Meriden, with respect to the exact tolerances to be observed in the manufacture of any particular component. It assumed that, if the component parts were manufactured in accordance with the contract specifications and drawings, and within the tolerances permitted thereby, there would be no problem in the components properly fitting together and being assembled into a workable tool.
In turn, Meriden did not concern itself specifically with the problem of whether the component parts it would manufacture would fit together and could be assembled into a workable tool. It too assumed that, if each part were made in accordance with the Government specifications and drawings, there would be no problem in their ultimate assembly by plaintiff into a properly workable tool.
23* Northern and Meriden, plaintiff’s principal subcontractors, were relatively small concerns which attempted to obtain outside financing to fulfill their large subcontract obligations. However, both found that the banks they approached were unwilling to lend the necessary funds to finance their subcontracts with plaintiff due to plaintiff’s then poor credit standing.
24. On July 9, 1952, Meriden commenced placing its steel orders.
*715 25. By letter of July 19, 1952, plaintiff notified the contracting officer of an error in the specifications concerning the dimensions of the boxes in which the tools were to be packed. The number of tools required to be packed per box could not fit into the box having the specified dimensions.
26. By letter of July 22,1952, the problems inherent in the manufacturing of the component parts within the broad specification tolerances and nevertheless making them fit properly into a satisfactorily functioning tool were brought to plaintiff’s attention by Northern Handle Mills, its handle supplier. The letter raised the question of fitting the handles to the sockets and requested some sockets “from which the chuck maker can work in order to come up with chucks that will chuck the handles to fit your sockets.” The supplier added:
Of course, under our contract we could go ahead and supply the handles within the tolerances of the specification but should, for example, the sockets vary to the low tolerance and our handles vary to the high tolerance, or vice versa, you readily see where you could have fitting difficulty yet both the socket and the chucked portion of handle might be within the tolerances permitted by the specifications of the respective contracts.
We have handles in process and intend to be on schedule with shipment of socket fitting handles if you can get the sockets to us promptly. If you are unable to send them immediately it may become necessary that you accordingly extend (the initial shipping date or have us ship handles not fitted to your sockets in order that we ship in accordance with contract schedule which would transfer the handle socket fitting problem to Springfield.
Plaintiff did not send to Northern any sockets, as suggested. At that time it had none to send.
27. Under an agreement with the RFC dated August 4, 1952, the RFC authorized a second loan to plaintiff in the amount of $500,000, repayable in full by September 30,1953, repayments to be made at the rate of $12,500 in the months of January through April 1953; $25,000 in June 1953; $200,000 in each of the months of July and August 1953; and the balance at maturity. Plaintiff’s note to evidence this transaction was dated September 12, 1952. As of that date, plaintiff still owed RFC $207,260.65 on the first loan. The *716 second loan was secured by the same security as the first loan (plaintiff’s property), and, in addition, by an assignment of all moneys due or to become due from the Army under the three intrenching tool contracts, as well as a factor’s lien on all inventory relating to said contracts. Except for $56,000 which was permitted to be used for capital expenditures required to perform the contracts, the loan agreement restricted the use of the funds to expenditures necessary and essential to the operation of the Government contracts, and required plaintiff to maintain a separate bank account, called the cash collateral account, for deposits and withdrawals in connection with the contracts. All moneys received by RFC under the assignment of the contracts were releasable in the sole discretion of RFC for such operating expenses provided the amounts due to plaintiff on the contracts were equal to 125 percent of the unpaid balance of the loan. Before making any disbursement to plaintiff for operating expenses, RFC had the right to satisfy itself that there had been no adverse change in the financial condition, operations, or business prospects sufficient to warrant withholding further disbursements. In addition, plaintiff was required to submit monthly reports showing shipments of tools to QM and weekly inventory statements.
As a matter of mechanics, as plaintiff made shipments of tools to the Army, it billed the Army therefor'. The Army made prompt payment of plaintiff’s invoices, taking discounts. The Army’s payments were sent, under plaintiff’s assignment thereof, to the RFC and deposited in the cash collateral account. The RFC then retained certain amounts to reduce advances that had been made on the loan, and the balance of the Army’s payment then was disbursed to plaintiff. Thus, except for a limited amount of preliminary advances principally to enable plaintiff to equip its assembly line, RFC funds would only be released upon shipment's of completed tools to the Army. In the meantime, plaintiff’s suppliers and subcontractors would have to be paid for work done and supplies furnished on such tools from plaintiff’s general funds. Lacking sufficient amounts thereof, they would necessarily have to wait until plaintiff received the funds from the RFC.
*717 28. By letter of October 7, 1952, Tucker advised plaintiff that lie and bis partial assignee agreed to accept the reduced total amount of $0,037 per unit on the intrenching tool contracts, and that “the weekly payments of $100.00 will be deducted from such amounts.” Thus, based on the number of tools to be produced, total payments would amount to $39,479.
29. By October 31, 1952, no deliveries of tools had been made under contract 18703, which provided for the delivery of 50,000 by such date. Similarly, by November 30,1952, no deliveries of tools had been made under contracts 18702 and 18704, each of which provided for initial deliveries of 50,000 during such month.
No production of component parts had as yet commenced by Meriden. The steel strike had prevented it from obtaining the necessary steel.
80. On November 3, 1952, plaintiff issued a second purchase order to Meriden calling for an additional 533,500 sets of the four components, being the same number as was ordered by the first order of June 25,1952.
With said two orders, plaintiff had on order a sufficient number of the major components (1,067,000) to assemble the total requirements of its three contracts.
31. (a) The specifications provided (MIL-I-11519, Nov. 1,1951, par. 3.1) that six samples of the finished tool should be submitted to the contracting officer for approval “before production is commenced.” On November 6, 1952, plaintiff submitted six such samples.
(b) Prior thereto, Meriden had proposed that the socket be made in a manner different from that prescribed in the specifications, which provided that it was to be made of blank or flat sheet or strip steel and then rolled and welded with welding electrodes. However, Meriden concluded that it would be most difficult to manufacture the socket in this mamier and still meet the specification dimensional requirements which called for a tapered socket with a tapered wall thickness. Therefore, as an alternative, Meriden proposed that the socket be made out of tubing by a hot formed process. Since this was a deviation from the specifications, plaintiff sought permission from the contracting officer to use the hot formed tubing method. Pending a decision by *718 defendant, the samples submitted contained sockets made of tubing. However, these sockets were made of steel having a carbon content which was lower than that called for by the specifications. All of the other components made by Meri-den were made from production dies.
32. By letter of November 24,1952, the contracting officer wrote to plaintiff concerning the six pre-production samples it had submitted, and advised that three samples had been forwarded to the QM Research and Development Laboratory at Jeffersonville, Indiana, for blade and pick metal hardness tests and for strength tests. Pars. 3.5.1 and 3.5.2 of the specifications provided for 150-pound strength tests on the blade and pick, respectively, to be performed with such parts held in a fixed position, and 150-pound loads being applied at a certain point of the handle, all “without fracture or permanent deformation of any part,” and without permanent deflection (in excess of % inch) after release of the load. Par. 4.3.1 provided further that the tool should be tested as above described for the blade, but under a 375-pound load and that “the slowly applied load of 375 pounds shall not result in any complete failure of any component of the intrenching tool.” The specifications also provided certain hardness requirements, in accordance with tests to be made on a Rockwell testing machine, for the various metal component parts of the tool.
The contracting officer advised in this letter that the results of the hardness tests on the blades and picks exceeded the máximums permitted by the specifications; that the 150-pound strength tests on the blades- and picks resulted in greater permanent deflections than permitted by the specifications; and that the 375-pound strength test on the blade resulted in a fracture of the hinge at 202.5 pounds. Excessive looseness or rattle, as well as several dimensional deviations from the specifications, were also noted, as was the nonspecification carbon content of the socket steel tubing, together with improper wall thickness of the part. Other deficiencies in other parts were also pointed out. The officer also advised that he was attempting to obtain a decision from the R & D Laboratory on plaintiff’s request to use tubing for the socket and as to the carbon content of the tubing. A re *719 quest by plaintiff that the hardness requirements with respect to the hinge be reduced was denied, it being pointed out that on units produced in the past the Ames tools) the blades had withstood a strength test of 450 pounds without any hinge breakage.
As a result of the above-described deficiencies, the samples were not approved. Plaintiff was required to submit further samples that complied with the specifications, permission being given, however, to submit such samples with tubing sockets.
33. By letter of December 12, 1952, the contracting officer supplemented his letter of November 24,1952, concerning the pre-production samples and authorized the use of seamless steel tubing with a specified carbon content (.45 or “#1045 steel”) for the socket, provided the socket met the other requirements of the specifications. He also stated that the B & D Laboratory had further advised concerning additional dimensional deficiencies in the components of the six pre-production samples, which the letter set forth in detail.
34. On December 29,1952, plaintiff’s director of purchases (Shaw) and a representative of Meriden (Kulcher) went to the offices of the QM in Chicago and personally submitted to the contracting officer five additional pre-production samples, four being completely assembled and one being only partially assembled for defendant’s ready inspection.
At the same time, plaintiff’s representative submitted a letter, dated December 27, 1952, which was in the form of a transmittal letter covering the five samples. But for the nonspecification low carbon socket tubing, the letter stated that plaintiff believed the samples “to be within present specifications,” except that “there may be some minor points at issue as per [plaintiff’s] two letters to you of 22 December,” which points plaintiff stated it proposed to discuss with the contracting officer on its next visit to Chicago. As to the steel tubing, plaintiff explained in the letter that it had placed “for some time” orders for the required #1045 steel tubing, but shipments were not forthcoming. Plaintiff had sought defendant’s aid in procuring such steel. To avoid further delay, plaintiff suggested the possibility of defendant’s permitting the use of a lower carbon steel.
*720 As shown by this letter, plaintiff, as of that time, apparently had no complaints or criticisms of any substantial nature concerning the accuracy or adequacy of the specifications or drawings. Except insofar as the testimony discloses the conversations actually had on December 29, 1952, the record does not show what were the “minor points” plaintiff referred to in its two letters of December 22, 1952, as these letters are not in evidence.
A conference was then held on that day (December 29) at which plaintiff’s representatives discussed with the contracting officer the difficulties they were having in obtaining the #1045 carbon steel tubing, as set forth in the letter. Although the steel strike had terminated, it was still difficult to obtain steel, and defendant’s aid (on a priority basis) was sought. The contracting officer stated he would do what he could to expedite the steel deliveries. Plaintiff’s representatives also inquired about the possibility of using a different steel, as suggested in the letter, but obtained no permission to do so.
E & D also had a section in Chicago which was available to the contracting officer for advice concerning technical matters. In instances where the section could not give the contracting officer the required technical advice, such officer, who was in the Procurement Division of QM, would refer the matter to the responsible officials of such Division in Washington, who, in turn, would refer it to E & D, which was an independent division of QM.
At this December 29 conference, plaintiff’s representatives wished to discuss certain technical matters pertaining to the tools. Accordingly, the contracting officer had them discuss such matters with an official of the E & D section in the Chicago Depot. Plaintiff’s representatives discussed the size of the hole in the handle, the size of the packing box, and the excessive play in the tool. As to the latter, plaintiff’s representatives felt that as long as wide tolerances would be permitted, such play would necessarily result. However, these matters were not resolved at that time.
At this conference the contracting officer explained that, as was the situation with the previously submitted samples, three would be sent for testing to the E & D Laboratory at *721 Jeffersonville, Indiana. Plaintiff’s representatives inquired of tlie contracting officer whether it would be possible for them to be present at the laboratory during the tests. They felt it would be helpful if they could observe the tests to which the tools were subjected and there be able to clarify such matters relating thereto as might arise. The contracting officer stated that he would ascertain whether this was possible upon receipt from plaintiff of a written request which he could formally present to the B. & D officials.
35. By letter of December 31, 1952, plaintiff’s director of purchases sent the following letter to the contracting officer:
I would like to request permission for Mr. Kulcher of Meriden Industries and myself to witness the testing of the three samples of intrenching tools which have been sent to Jeffersonville from the second lot of pre-production samples.
This observation would be for our own information, and I believe will enable us to check on some interpretations of the testing equipment as well as to discuss various points in relationship thereto.
I would appreciate as much advance notice in this connection as you can give us, so that we can make the proper reservations in time.
As he had previously stated he would do, the contracting officer processed this request to the Eesearch and Development Division through the office of the Quartermaster General.
36. (a) For the year 1952, plaintiff suffered what was for it a huge loss of approximately $147,000. Its total sales fell to approximately $1,760,000. Its civilian market dropped to sales of approximately $1,600,000. Expenses on plaintiff’s development program for new heating equipment continued. Plaintiff’s working capital fell drastically to approximately $12,000, resulting primarily from a decrease in its inventories (approximately $160,000). Plaintiff’s net worth fell to approximately $430,000. Its current asset ratio dropped to $1.02. Due to the steel strike, no intrenching tools could be produced in 1952 and therefore no income could be obtained from the three tool contracts during 1952. However, plaintiff incurred expenses during the year of approximately $31,000 (salaries and wages, traveling expenses, *722 etc.) in connection with such contracts, and spent approximately $39,000 on machinery and equipment in connection therewith (riveting machines used in assembling the tools, a conveyor system, other assembly line equipment, painting equipment, etc.). These capital expenditures were made from NFC loan funds. The steel strike was costly to plaintiff.
As of December 31, 1952, the balance of the loan due to the Springfield National Bank was approximately $111,300 for which plaintiff had pledged accounts receivable in the amount of approximately $163,500. Also, as of such date, the balance due on the two RFC loans was approximately $242,000, of which approximately $187,000 was due with respect to the first loan and approximately $55,000 with respect to advances made on the second loan.
(b) Defendant was in no way responsible for the large loss plaintiff suffered in 1952. Production operations on the tool contracts had not even commenced during the year. The delay in such commencement was not attributable to defendant.
87. By letter of January 6, 1953, the contracting officer advised plaintiff that it would not be possible to give it permission to view the testing of the samples at the laboratory. The letter read as follows:
Reference is made to your letter dated 31 December 1952 relative to a request for permission to witness the testing of three (3) samples of Intrenching Tools which had been forwarded to Jeffersonville Quartermaster Depot.
Please be advised that this office has just been informed by representatives of the Office of the Quartermaster General that such authority cannot be given and that the results of the tests will be forwarded to your office as promptly as possible. As a consequence of the above, you will be informed as to any new developments relative to inspection of the samples of the Intrenching Tools received by this office.
Normally, on a contract administered by a Procurement Division contracting officer, all contractor contacts with defendant are made with such officer. It would be unusual to have the contractor in such a case maintain direct contacts with other Divisions of QM, including R & D. Thus, the *723 denial of plaintiff’s request was consistent with defendant’s general policy on this type of contract. Since the contracting officer sent plaintiff’s request to his superiors in the Procurement Division, who, in turn, forwarded it to the responsible personnel of R & D, the rejection of plaintiff’s request by the contracting officer was the result of rulings made by others.
38. (a) By letter of January 20, 1953, the contracting officer advised plaintiff that three of the five second-lot pre-production samples had been sent to the E. & D Laboratory, which reported that they had successfully passed the strength tests, but that the blade, socket, and hinge all failed to conform to the required hardness tests. Several other dimensional deficiencies were also noted, including the statement that:
The radius at the base of the vertical ear lugs of the hinge (both samples) is noted as having an excessive angle twist condition which might readily result in torsional stress which would not be known until strength tests were applied to an assembled unit.
As constructed, a hinge connected the socket to the blade, the narrow end of the socket being inserted into the vertical sides (lugs or ears) of the hinge, and the pick fitting onto, the outside of the vertical hinge sides. There were thus six thicknesses of steel to be joined (two on the socket, two on the hinge, and two on the pick) by a hinge pin which went through aligned holes in the three parts.
This letter noted that in one of the samples there was “a noticeable misalignment of holes in the lugs of the pick against the lugs of the hinge,” and that “assembly of the pick and socket component parts with the hinge was impossible due to this condition.” ( Since the specifications permitted a relatively large 1/82"incb tolerance, it would be possible to manufacture the parts with the holes within the tolerances but still not be aligned for assembly.) The letter “suggested that a check be made into this matter and this, condition corrected,” and closed with the following statements:
It is advised that as the purpose of the requirements for submission of “preproduction samples before production is commenced” is for the purpose of observing as *724 far as possible that the contractor thoroughly understands all requirements of the specifications and is endeavoring to comply therewith during production; and for the purpose of endeavoring to prevent production of end items not conforming fully to requirements which would result in rejection thereof and as — ■
a. You have submitted two lots of preproduction samples to date and have received our comments thereon and are aware of conditions to watch throughout production, therefore, it is not deemed necessary that you submit any further preproduction samples to this office. Therefore,—
b. One of the second lot of samples referred to above is being tagged for identification purposes of both yourselves and the QM inspector as being considered satisfactory for intent of requirements in general as to design, size and color of finish only. The discrepancy set forth in letter CQMD 20 January 1953 must ‘be eliminated in production. The material or finish not tested — contractors are obligated to know that all materials and finishes conform to requirements prior to the use thereof. The tagged sample, along with the other four samples are being returned to you Express Collect and the tagged sample should be retained throughout the life of the contract.
(b ) Shortly thereafter, production of ¡the component parts, except the socket, was commenced. Production of the sockets was delayed because Meriden was unable to obtain delivery of the required 1045 carbon steel until around February 16, 1953.
39. During the first stages of production in February 1953, plaintiff discovered that the contract drawings provided for a 3/16-inch depression in the hinge at a point where it was required to be mated, and thus to have metal-to-metal contact, with a ^4-inch (or %6-inch) depression (or “sump”) on the blade. This resulted in a %6-inch space between the two parts. This was an error in the drawings, since parts with such different dimensions could not, without forcing, mate. However, neither plaintiff nor Meriden discovered the error until production had commenced and after Meriden’s blanking and forming dies had already been made up on the basis of the dimensions as shown on the drawings.
*725 Plaintiff, upon discovery of the ambiguity, and being uncertain whether, under the circumstances, the drawings would be construed so as to require metal-to-metal contact, made sketches of its findings and delivered them to the contracting officer and to an inspection official on February 25, 1953. However, plaintiff received no immediate instructions from defendant with respect thereto. The record does not show what, if any, action the contracting officer took concerning this matter at that time. The question was apparently treated as falling within the jurisdiction of the Inspection Division with that Division being responsible for determining whether the drawings required the contractor to achieve metal-to-metal contact and whether it would therefore instruct its inspectors to insist thereon.
40. By letter of February 27, 1953, the contracting officer forwarded to plaintiff a new delivery schedule for the tools covered by the three contracts. The delivery date for the 50,000 tools under contract 18703 was extended from October 31, 1952, to April 3, 1953, an extension of 154 days. The delivery schedules under contracts 18702 and 18704 were similarly extended, with the first deliveries of 50,000 under each to be made by May 3,1953 (instead of by November 30, 1952, which again amounted to a 154-day extension), with deliveries to be made on each contract respectively in the amounts of 60,000 and 65,000 monthly, and with the final deliveries to be made on January 3,1954. The letter stated:
# if: # Hs
Due consideration having been given to all delays incurred up to this time in the delivery of Intrenching Tool, Combination, you are hereby formally notified that strict adherence to the inclosed delivery schedule is essential.
The 154-day delay was attributed to the steel strike and was considered excusable.
41. (a) The first deliveries of components from Meriden to plaintiff were in February 1953, during which month plaintiff received 4,026 blades and 4,045 hinges, but only 146 picks and 57 sockets. With this unbalanced inventory, plaintiff could not commence assembly operations. In the meantime, *726 kowever, defendant’s inspectors subjected the component parts to the required hardness tests.
(b) All inspections and testings by defendant’s inspectors stationed at plaintiff’s plant were conducted in the presence of representatives of the plaintiff. The results of all tests were incorporated in standard forms of reports signed by both the inspector and plaintiff’s representative.
(42. During the early part of March 1953, Meriden Industries encountered trouble in the preheating of the steel socket tubing which resulted in some delay in the production of sockets. Although Meriden had ordered a 200,000 BTU furnace, an 800,000 BTU furnace was erroneously delivered. When the error was detected, Meriden utilized two small furnaces instead. As of March 11, 1953, there was still no appreciable number of sockets delivered to plaintiff.
43. (a) On March 27, 1953, Meriden’s pick-making die broke down. This caused a temporary cessation of production on this part. In addition, it had been found necessary to make a new forging die for the socket. As of that date, the new die had not yet been tried or proved.
(b) Under the revised delivery schedule 50,000 completed and inspected tools were due for delivery on April 3, 1953 (finding 40). As of March 27,1953, it became obvious that plaintiff would be unable to meet this schedule. Plaintiff’s assembly line was put into operation for the first time in March. However, only about 1,500 tools had been assembled up to March 27,1953. The largest number of the four Meri-den component parts which had been delivered to plaintiff was 8,335 hinges. The number of picks and sockets delivered was much below the number of blades and hinges.
44. During the month of March 1953, Meriden delivered 17,079 blades, 9,210 hinges, 4,615 picks, and 5,130 sockets. Thus, as of that time, plaintiff had 21,105 blades and 13,255 hinges, but only 4,761 picks and 5,187 sockets. The unbalanced nature of this inventory enabled plaintiff to assemble only that number of tools equal to the lowest number of component parts.
45. (a) By April 3,1953, plaintiff had assembled approximately 3,900 tools which were ready for inspection. However, preliminary inspections made prior thereto showed that *727 the tools slightly exceeded the permissible weight limitations outlined in Par. 3.4 of the specifications, which provided:
3.4 Weight. — The finished Intrenching Tool, Combination, shall weigh 50 ounces (plus 2 ounces or minus 2% ounces).
Until a determination could be made as to whether this weight limitation could be waived, further inspections had been suspended. In addition, the first lot of 800 tools that had been presented for inspection had been rejected because of excessive play between the pick and the handle when the tool was in the closed position, as well as for certain dimensional defects. Thus, as of that date, no tools had as yet been accepted.
(b) To assist in making a determination on such weight waiver, and to investigate any other matters which were impeding production, the contracting officer (Captain Mc-Adams) and his chief (Lieutenant Colonel Wood, Chief of Purchasing, Clothing and Equipage Branch) visited plaintiff’s plant on or about April 3,1953. At this time plaintiff’s officials requested a waiver of the weight requirement. In addition, they requested authorization to chamfer (taper) the hinge pin to facilitate its insertion through the six steel thicknesses of the hinge, socket, and pick if the holes therein were misaligned. By a long distance telephone call to Washington on that day, the QM officials obtained permission for plaintiff to chamfer the hinge pin. On April 6, 1953, defendant authorized the waiver of the weight requirement on the tools in question.
46. As of April 10,1953, no tools had as yet been accepted, making plaintiff delinquent on the entire 50,000 that had been contracted for delivery on April 3,1953. Meriden’s new socket-forging die (finding 43 (a) ) had been tried out during the week, but, during such tryout, a part thereof broke, requiring repair. This socket-forging die had been the principal production bottleneck.
47. (a) On April 14, 1953, plaintiff presented the second lot of assembled tools for. inspection, consisting of 3,200 tools.
The lot was rejected because the socket hole was misaligned (“not centered”), thereby, in the words of the official *728 inspection record, “causing blades and picks to be cocked to one side of handle when in closed position.” This hole alignment problem had been called to plaintiff’s attention when plaintiff’s second set of pre-production samples was approved by defendant’s letter of January 20, 1953 (finding 38(a)). The tools had (evidently as a result of the misalignment problem) “bent sockets and warped ears on the picks.” In addition, one of the five samples failed the 375-pound strength test, and three failed the 150-pound deflection test (no permanent deformation of any part in excess of % inch).
(b) On the same day plaintiff requested and received permission for the conduct of a retest on Lot 2 by conducting a new series of tests on a set of five different samples from the lot. No reinspections could be made by the inspector without the express consent of the contracting officer (who would consult with the Inspection Division). After again failing the 150-pound strength test on the picks, the lot (now offered as Lot 3) was, however, accepted after plaintiff made certain pick modifications.
48. (a) By April 23, 1953, only 4,000 tools had been accepted by defendant for shipment. This consisted of the first lot of 800, which had subsequently been accepted, and the second-third lot of 3,200. A large number of sockets (over 2,100) had been rejected for Bockwell test failure.
(b) That day, April 23,1953, the September 30,1953, maturity date of the second NFC loan was, at plaintiff’s request, extended to April 1,1954.
49. In late April 1953, and after the two lots of 4,000 tools had been accepted, the QM Inspection Division determined, apparently as a result of the question raised by plaintiff in February (finding 39), that the contract drawings did require metal-to-metal contact between the hinge and the blade. Thereupon, the inspectors began insisting thereon, which they had not previously done.
Plaintiff at first attempted to solve the problem by doing re-forming work on the hinges in plaintiff’s own shop to increase the %6~inch dimension of the 'hinge to %6-inch. This was an additional operation which caused plaintiff increased expense in some unestablished amount.
*729 Plaintiff also proposed to insert a filler piece in the space, but this suggestion was not accepted.
Plaintiff finally decided that, under the circumstances, i.e., with Meriden’s production dies already dimensioned to the hinge and blade measurements specified in the drawings, metal-to-metal contact could be obtained only by forcing such contact through pressure on the rivet which joined the hinge and the blade at the depression points. However, this naturally created stresses and strains on both parts at the rivet point.
50. During the month of April 1953, Meriden delivered 6,348 blades, 9,135 hinges, 21,545 picks, and 21,507 sockets.
Thus, as of the end of April 1953, Meriden had delivered to plaintiff a total of 27,453 blades, 22,390 hinges, 26,306 picks, and 26,694 sockets, thereby providing plaintiff with a more balanced inventory.
The number of components that had been delivered was, however, far below plaintiff’s contract requirements.
51. On April 27, 1953, plaintiff submitted its fourth lot, consisting of 3,200 tools. This lot was rejected for failure to pass the 375-pound strength test. On April 28,. 1953, a fifth lot of 1,280 tools was rejected for the same reason, a handle breaking on one sample and a hinge on another. On April 29, 1953, Lot 6, comprising 1,300 tools, passed inspection. On May 5, 1953, Lot 7, consisting of 3,040 tools, was rejected for strength-test failure, hinges snapping on three samples and a handle on one. Thus, three of the last four lots presented, consisting of 7,520 tools, were rejected.
On May 7, 1953, defendant reduced the strength test requirement to 350 pounds plus or minus 5 percent. Thereafter, on May 11, after plaintiff re-screened Lots 4, 5, and 7, eliminating 40, 20, and 40 nonconforming tools, respectively, and presented them for re-testing, the remaining 3,160,1,260, and 3,000, respectively, passed inspection and were accepted. Lot 7 had, on May 7, 1953, failed to pass the second test, hinges breaking on two samples. Thus the May 11th test of this lot was the third.
The re-screening process was time-consuming, and caused plaintiff’s employees to divert their efforts from the assembly line. For instance, between May 7 and May 11, 1953, *730 while plaintiff’s employees were re-screening Lots 4, 5, and 7, practically all assembly line operations ceased.
52. By May 3, 1953, on which date plaintiff’s contracts Í8702 and 18704 required 100,000 tools to be delivered, no tools with respect thereto had been delivered. All prior acceptances and shipments had been allocated to contract 18703, and this remained the procedure until the 50,000 tools under such contract were delivered.
Despite plaintiff’s constantly urging Meriden to expedite the shipment of sufficient components, Meriden failed to forward the amounts necessary to enable plaintiff to meet its contract requirements to defendant. Sockets continued to be the main production ¡bottleneck. As of May 8, 1953, Meriden had delivered to plaintiff a total of only 21,368 sockets, far below plaintiff’s requirements. Meriden was producing these sockets by a hot rolling or forming method which did not prove satisfactory. Among other things, some sockets were found to be too short.
53. On May 15, 1953, the cushion under Meriden’s pick-blanking die broke. Its repair took over 1% months. This severely retarded the production of picks during this period.
54. (a) On May 27, 1953, three officers of QM at Chicago (Colonel Ely, the new chief of the Clothing and Equipage Branch; Herman Bush, chief inspector of the Inspection Division; and Mr. Przewlocki of the Inspection Section of the Chicago QM Depot) visited plaintiff’s plant to investigate the status of plaintiff’s contracts and the cause of the limited production thereon. Defendant’s officials remained at the plant three days. At the conference, plaintiff reiterated its problems revolving around the error in the drawings which prevented the metal-to-metal contact. In addition, plaintiff also claimed an error in a drawing which resulted in interference between the washer and the ears of the pick and which prevented the point of the pick from seating against the handle when in a closed position. Cutting out material from the pick to give clearance would result in weakening the pick, possibly resulting in breakage-during the strength test. On May 29, Kulcher of Meriden Industries joined the conference to seek explicit instructions about this point. A third problem discussed also related- *731 to an error in the drawings which resulted in the pick interfering (“biting”) with the blade during closing. The rising curve of the flange at the heel of the blade hit the point of the pick ear as it revolved into closing position. This “bite” prevented the flange of the blade and the heel of the pick from contacting each other, a contact which would give the tool additional strength.
These three problems were the major ones presented by plaintiff. Others of a minor character, upon which plaintiff desired clarification, were also presented. Plaintiff felt that the elimination of the three errors in the drawings would provide contacts which would strengthen the tool and eliminate so many of the strength test failures it was experiencing.
It was agreed that plaintiff would follow the regular practice of submitting the entire matter in writing to the contracting officer and detailing the problems about which they were concerned. The questions plaintiff was raising involved technical matters which would have to be considered by E&D. That Division had prepared the specifications and drawings and would ultimately be responsible for making the determinations concerning any corrections or amendments thereto. Plaintiff’s officials felt that if they could discuss these technical questions personally with the E&D officials at the Jef-fersonville Laboratory, the matters could be quickly resolved. Defendant’s officials replied that, although such procedure would be most unusual, they would attempt to arrange it, provided plaintiff would first follow the accepted procedure of reducing the problems to writing for presentation to the contracting officer so that he in turn could present the matter to E&D. In the meantime, plaintiff was instructed to continue manufacturing the tools in accordance with the specifications and drawings.
(b) During this three-day period, defendant’s officials also visited Meriden Industries’ plant and discussed Meriden’s operations with its officials. In addition, they visited plaintiff’s subcontractor who performed the heat treatment on the parts manufactured by Meriden.
(c) Defendant’s representatives came to certain conclusions and made various recommendations to plaintiff and Meriden. They felt it would be necessary either for Meriden *732 to obtain a second set of dies or for plaintiff to obtain a second source of supply for the component parts Meriden was manufacturing. They felt plaintiff should not be at the mercy of a short supply of any one component. They also correctly felt that plaintiff’s and Meriden’s own inspection and quality control procedures were deficient. During this period, Meriden did not have in its own shop any rigid or standardized system of inspection of the quality of the items it produced.
On the other hand, plaintiff’s and Meriden’s officials felt that a good part of plaintiff’s troubles lay in the defective drawings and specifications they had to work with, causing them to do research and design work to perfect the tool, which work, they contended, should not be performed by the large-scale production manufacturer.
(d) There was merit to the respective positions taken by both sides. However, without absolving defendant’s issuing contract drawings containing errors, it is not clear why plaintiff did not discover them and point them out in connection with the pre-production samples and prior to commencing with production. The very purpose of providing for such samples was to make certain that all matters would be ironed out prior to entering upon the production runs. Since these contracts were entered into on May 26,1952, and under the revised delivery schedule the first deliveries were not due until April 3,1953, plaintiff had “lead time” of over 10 months within which to make complete arrangements for satisfactory large-scale production. Yet plaintiff’s organization did not discover the deficiencies in the drawings about which it was complaining until February 1953, when it went into production and after Meriden’s production dies had been made.
On the other hand, it is similarly not clear why defendant, if it was going to insist on such metal-to-metal contact, did not discover the lack thereof at the time the pre-production samples were presented to it and why it finally approved such samples without such contact. The conditions attached to such approval did not specifically mention any such requirement (finding 38(a)). Similarly, it is not clear why defendant did not take prompt action to correct the error *733 when plaintiff called it to defendant’s attention on February-25,1953 (finding 39).
55. On June 12, 1953, three Change Orders No. 1 were executed on the three contracts, which orders changed the dimensions of the boxes in which the tools were to be packed so as to correct the error which plaintiff had called to defendant’s attention on July 19, 1952. By these change orders, the unit price of the tool was increased by approximately, four cents ($0.0428), making the new unit contract price $1.8428. There is no showing that plaintiff suffered any loss as a result of this error. The matter was resolved prior to its causing any shipment or other delays.
56. On June 23, 1953, an official of plaintiff telephoned QM in Chicago and inquired about the matters which were the subject of the May 27-29 discussions. It was again agreed that plaintiff would submit a detailed letter on the matter. The evidence does not make clear why plaintiff delayed so long in submitting the letter it had promised to write during the May 27-29 discussions.
57. On June 24, 1953, plaintiff submitted a letter to defendant “outlining in part, our findings resulting from research of the subject tool
The data presented below are intended to be a completely factual and objective statement of our findings and research. We have high admiration for those who prepared the drawings, specifications, and SIP and we regard the data we are presenting as a natural corollary of the process of going into production. We present them for evaluation without any contentiousness whatever. The items covered below are what we regard as that most important which have come to light in our research of the subject tool to date.
Plaintiff then detailed the three problems discussed with defendant’s officials at the conference at plaintiff’s plant during May 27-29, 1953. As to the hinge-blade metal-to-metal contact problem, plaintiff stated, in part:
The hinge provides for a depression as shown in cross-section which %6" dimension is_mated to the y^"' depression in the blade as shown in Fig. 2 Section C-C. This leaves i/16" clearance between the two mating parts. Your Chicago Inspection Division required a metal to metal seat at this point where the %6" clearance dimen *734 sion occurs; and. we have been forced to reform the hinge for an additional depth of %6" in order to make those two parts come together.
The original blanking and forming dies were made up from details shown on Figure 2 Intrenching Tool, Combination and the ref orming work has had to be an additional operation done in our own shop to increase the %6" dimension of the hinge to approximately 14".
The situation ivas discovered in the first stages of initial production. Sketches of our findings were made months ago, but these did not bear our corporate name plate. A set each was delivered to Mr. Przewlocki and Captain McAdams on 25 February, 1953, but regrettably no letter of transmittal or explanation, other than that given Mr. Przewlocki was formally recorded at that time.
Plaintiff suggested either that the forming dies be changed “so that the 14" depression in the blade is changed to %6", to conform with a similar dimension on the hinge” which would be “a major change and would require time to accomplish” or that plaintiff be authorized, at least until the new forming dies could be obtained, to use a filler piece approximately %6-inch thick.
As to the pick-blade “bite” problem, plaintiff stated, in part:
* * * This interference may be seen clearly by inspection of current production. * * * In testing these tools to ultimate destruction we have found a number of instances where failure starts at this “bite”.
* * * [W]e are getting interference at this point in practically all of our assemblies.
Plaintiff pointed out that, although the pertinent contract drawing “shows the desired assembly in which the flange of the blade and the heel of the pick rest against each other,” in fact, such “mating of the parts at this point is impossible because of the point of interference * * that “it will be recalled that at the conference [of May 27-29] considerable discussion took place over the necessity of contact at the heel and blade which is currently impossible until the error in assembly between pick and blade is corrected”; and that:
We realize that it may quite properly be pointed out that a great many tools have passed through our assembly line with a minimum amount of breakage, but we sug *735 gest that all the evidence joints to the fact that this assembly is a marginal during the 350 pound test. It seems to us that no error should remain uncorrected, which may possibly have a detrimental effect on end results.
As to the washer-pick ear interference problem, plaintiff stated that, in its opinion, the cutting out of pick material so as to create a relatively large “swedge” indentation for washer clearance, as provided by the contract drawings, would weaken the pick at a vital point and possibly cause breakage in the strength test; that “[i]nitial production of these was, as we feared on (the weak side in that a small proportion failed to meet the 160 pound pick test”; and that it was convinced that “breakage was simply a case of mechanical weakness caused by too much washer clearance.” Instead of cutting out a part of the pick to provide washer clearance, plaintiff proposed “a milling operation” which “gives only minimum clearance for the washer and at the same time is producing excellent results in seating of the pick against the handle.”
Plaintiff then stated:
We maintain that:
(1) The acknowledged error in the drawing creates a lack of contact pick to blade and is likely to prove a contributing factor in causing failure in that the pick does not properly support the assembly, if at all, until very considerable strains are set up in the hinge.
(2) This acknowledged error in the drawing should be corrected without delay.
(3) The reforming work on the hinge * *' * is extra work and expense and may conceivably have some contribution toward hinge failure which occurs close to this point. It should be eliminated at the earliest possible moment.
Further, plaintiff requested that a certain lot (Lot 14) which had been rejected because of hinge failures during the strength test, be re-tested “using the method of inserting a steel filler piece between the hinge and the blade * * *. -We believe we are fully entitled to make this request since the errors pointed out in the drawing make contact at this point impossible. * * * It does seem to us that we are entitled to the consideration with respect to the lots which now *736 stand rejected and that this consideration should stand in effect until the recommended changes caused by the errors in the drawings can be put into effect.” Plaintiff closed by saying that the items mentioned in the letter were “the more important which have come to light in our research so far. As will be remembered from the conference in May, other drawings were presented which, while of a minor nature will be forwarded to you within a few days.”
58. By letter of June 30, 1953, to plaintiff the contracting officer (Davis) advised that the proposals contained in plaintiff’s letter of June 24 had been forwarded to B, & D. The letter also expressed disappointment with plaintiff’s performance, noting that during June plaintiff had presented five lots totalling 14,000 tools for inspection, of which two lots, total-ling 4,400, had been rejected, and that the only June shipment was a carryover from May. The contracting officer insisted that plaintiff make immediate arrangements for additional sources of supply to obviate bottlenecks in production such as were caused by Meriden’s pick die failure.
59. At about this time (July 1, 1953) plaintiff realized it would not be able to fulfill its contract requirements with Meriden as its sole supplier of the four component parts. Meriden appeared either unable or unwilling, because of the financial problems involved, to fulfill plaintiff’s large-scale needs for component parts. Even prior to its receipt of the contracting officer’s letter of June 30, 1953, urging plaintiff to obtain additional sources of supply, plaintiff commenced seeking such a second source for the four parts. However, for reasons not explained by the record, but in all probability due, at least in large part, to plaintiff’s then unsatisfactory credit rating, negotiations with two such possible sources never materialized so that almost throughout the life of the tool contracts, plaintiff was dependent solely on Meriden for the parts it was manufacturing. (Towards the end of the contracts, plaintiff itself took over the manufacture of the blades.)
60. By letter of July 8, 1953, plaintiff responded to defendant’s letter of June 30, 1953 (finding 58), and stated that “the errors and omissions in design * * * are the crux of our difficulty and must be resolved if uninterrupted ship *737 ments of tools are to be made from now on”; that when plaintiff 'bid on the contracts it “did so with the fall expectation that the item had 'been tried and proven, i.e., completely engineered and ready for manufacturing”; that instead plaintiff “found it necessary to do an immense amount of engineering and research due to these errors and omissions in the drawings and/or specifications which you famished to us”; and that “the extra work entailed has been very costly to this company.” The letter concluded:
We note your comment that you would refer these matters to your Research and Development people, i.e., our request for these corrections. It will be recalled that several months ago we requested representatives of this company meet and discuss these errors with the people of Research and Development at Jeffersonville. This request was denied.
We are of the opinion that had this request been granted these design difficulties would now have been resolved.
May we earnestly repeat our request that such a meeting be arranged ?
61. On July 14, 1953, pursuant to permission granted by QM on July 10, 1953, plaintiff’s representatives (Harvey, chairman of the board of directors; Shaw; and Kulcher of Meriden) conferred with personnel of the R & D Laboratory at Jeffersonville, Indiana, concerning numerous items which plaintiff felt constituted errors in the specifications and drawings, including the three items specified in plaintiff’s letter of June 24,1953. It was agreed that plaintiff would submit in writing a complete list of the corrections and changes it desired.
62. By the middle of July 1953, when plaintiff was still in the early stages of production, it was in an unsatisfactory state of liquidity and finding it difficult to pay its subcontractors for work performed on the contract. On that date, July 15, 1953, its handle supplier wrote to plaintiff calling attention to its invoices remaining unpaid since May 27,1953, and stating:
This firm, as previously discussed, is desirous of effecting an arrangement where payments of our invoices * * * may be assured within the shortest possible period.
*738 It was expected at the time we took this order that it could foe assigned to a bank to obtain the necessary production funds but our bank found your firm unsatisfactory to it for the loan. Subsequently we have carried the account from our own resources with the thought that if necessary we would be able to assign our invoices against Harvey-Whipple, Inc., for handles ordered shipped but recently we have made efforts 'along this line and are sorry to advise that again we have not been able to find an individual or a bank that would loan us money on assignment of invoices against Harvey-Whipple, Inc.
63. On July 23,1953, a lot of 1,200 end items was rejected for failure to pass the 350-pound strength test. Authorization was received, however, for the plaintiff to screen the •entire lot to weed out the defective items and then to re-submit it for re-inspection. A production run of hinges had embodied some defectively formed ones with weak sections. This lot of tools contained the last of such run of hinges .and it was felt that a 100 percent screening of the tools would eliminate those containing the defective hinges and which may have contributed to the original failures. A failure of ¡a tool, however, might be due to more than one cause.
64.. (a) On July 25,1953, plaintiff sent a letter to the It & D Laboratory to which was attached a list of the items that had been discussed on July 14, 1953. The letter stated, in .part:
These items are the things that have caused us delay up to the moment and must be resolved before steady, consistent production can be maintained with a minimum of rejected tools.
We are attaching to, and thereby making a part thereof, of this letter a copy of our letter to Chicago Quartermaster Corps, dated June 24th, which further amplifies some of the points covered in the appended list of changes and/or error or omissions. We wish to take this opportunity to tell you how much we appreciated the opportunity of having our personnel talk with you and would like to reiterate that we feel it was long overdue and regret that we were not permitted to see you long before we, did.
(b) On the same date, plaintiff, by letter to QM at Chicago, sent it the identical list.
*739 (c) The list, headed “Necessary Corrections And/or Changes to MILf-1-11519 (QMG), dated 1 Nov. 51,” set forth 24 separate items. The first 16 covered proposed changes in the drawings; 6 pertained to changes in the specifications so as to permit less stringent requirements concerning the tests (Kockwell, deflection, and strength); 1 referred to the chamfering of the hinge pin; and 1 to the weight of the handle.
65. During this 1953 period, plaintiff also encountered considerable difficulty in fitting the handles to the sockets. This was the very difficulty that plaintiff’s handle supplier envisaged a year earlier (finding 26). Some of Meriden’s sockets came through on the high side of the tolerance, some on the low side, and some in between. Considerable time was spent by plaintiff’s employees working with gauges and separating sockets and handles in separate piles in order to achieve selective fittings. Plaintiff ultimately directed its supplier to manufacture and ship handles in four sizes, in order to permit plaintiff to fit the handles into the various sizes of sockets 'being delivered by Meriden.
Had plaintiff properly handled the problem in the first place in accordance with Northern Handle Mills’ suggestion, its inefficient and wasteful procedure of fitting the handles to the sockets would have been eliminated.
66. (a) On August 7,1953, plaintiff completed its final deliveries on the 50,000 tools required under contract 18703. These deliveries had been due April 3,1953.
On this contract, plaintiff had presented 45 lots for inspection and testing comprising 75,004 tools, of which 62,171 were accepted and 12,883 rejected. (The excess over 50,000 was applied to the other contracts.) Thus, rejections represented over 17 percent of the. number of tools inspected and tested.
(b) The great bulk of these final rejections (even after re-screenings and re-testings) was based upon failure of the 350-pound strength test. These failures took the form of fractures at the base of the lobes of the hinges (i.e., where the hinge was attached to the blade) and blade fractures at the center of the blades (also where the hinge was attached). It is not possible to isolate with certainty the factors causing *740 or contributing to every failure. Some of the hinge fractures were apparently due to defective steel. Two lots to-talling 2,310 tools were rejected for blade fractures which apparently were due to too hard or brittle steel. However, a contributing factor may well have been the error in the drawings making it difficult to achieve metal-to-metal contact between the hinge and the blade, as well as the washer clearance and blade-pick “bite” matters about which plaintiff had complained and which may have contributed to weakness in the tool. As noted, with the %6-inch space between the two parts, and the inspectors insisting on metal-to-metal contact, such contact was attempted to be obtained by forcing down the rivet attaching the hinge to the blade at the blade-depression point to such an extent as to close the gap. However, this necessarily created such stresses and strains between the parts that when the further stresses and strains resulting from the rigid strength test were added, it was possible that the hinge or the blade would crack at or near such rivet point.
However, numerous samples tested more than met the test requirements. Some tools withstood pressures in excess of 400 pounds. Nevertheless, the very large number of hinge and blade failures during this period compels the conclusion that a contributing factor was the attempted correction of the dimensional discrepancy in the drawings. The other-two factors may well have also contributed to tool weaknesses and test failures.
67. As of August 14, 1953, Meriden found itself with approximately $35,000 owed -by plaintiff on shipments already made. This put a severe financial strain on Meriden’s resources since, as above noted, it had not been able to obtain large-scale bank financing to assist it in performing its subcontracts with plaintiff due to plaintiff’s then poor credit rating. On that date, Meriden’s officials telephoned QM in Chicago and discussed plaintiff’s financial situation with them.
68. (a) On August 21, 1953, plaintiff’s and defendant’s representatives held a conference in Washington, D.C., to discuss the proposals submitted by plaintiff in its letter of July 25,1953. Of the 19 conferees present, 12 (including the contracting officer and representatives of the R&D Inspection *741 Divisions) represented defendant and seven represented the plaintiff (including two representatives of Meriden). Each of the plaintiff’s 24 proposals was discussed and it was ultimately agreed that 20 of them would be accepted by defendant and incorporated in a formal change order, including, as the first item, correcting the drawing showing a %-inch depression in the blade so as to make such depression %6-inch. Changes in dimensional drawings to eliminate the interference or “bite” between the blade and the pick, as well as to take care of the washer clearance matter, were also agreed to.
(b) One of the matters discussed at the meeting was the problem created by the sockets thus far manufactured by Meriden having shorter threads than called for by the •specifications. At that time, approximately 110,000 sockets had already been manufactured or were in process. It was agreed that plaintiff would present a proposal to defendant for defendant’s acceptance of tools containing such short threads, but defendant made plain it would not accept, beyond said quantity of 110,000, any tools in the future with such short threads. As to the 110,000, however, it was agreed that the inspectors on duty at plaintiff’s plant could proceed with the inspection of lots containing said 110,000.
(c) It was further agreed that, prior to the incorporation of the changes agreed upon in a formal change order, plaintiff would submit its proposal as to the costs involved, as well as a revised delivery schedule which the changes would necessitate.
,09o Plaintiff’s delinquency in meeting its contract delivery schedules had mounted each month. By September 3, 1953, defendant had accepted a total of only 20,000 tools, as against a combined contract 18702 and 18704 requirement of 600,000, leaving plaintiff with a delinquency of 580,000.
On September 4, 1953, plaintiff presented its Lot 20 for inspection and testing, consisting of 1,200 tools. This lot, as well as Lots 15, 16, 17, 18, and 19, which had been presented for inspection commencing August 25, 1953, were all tentatively rejected because the contours of the picks and the threads on the sockets deviated from the contract requirements. This was the same thread matter that had been discussed at the August 21st meeting. However, because these *742 specification deviations did not affect either the serviceability or the appearance of the tools, some plan was attempted to be worked out for defendant’s acceptance of the-7,200 tools involved at some reduction in price. Such arrangement was not consummated until December 21,1953, as Supplemental Agreement No. 3 to contract 18702, under which defendant accepted the tools at a six cent per unit reduction in price.
After September 4,1953, when the sixth successive lot had been rejected by defendant since August 25, 1953, plaintiff suspended the presentation of further lots for inspection and testing. These rejections based on nonspecification pick contours and socket threads were plaintiff’s responsibility and were not related to any specification or drawing errors or defects. Their rej ection at the time by defendant’s inspectors was appropriate. The agreement for their ultimate acceptance at a reduced price had not as yet been worked out. In the meantime, however, the heavy rejections prior to said six lots, plus such six lots, took their toll on plaintiff’s finances-For one thing, no Army or RFC income was forthcoming to plaintiff on such rejected tools, although plaintiff became involved in financial problems with its suppliers and subcontractors with respect to services performed and supplies furnished on such tools. Plaintiff all along had not been in a satisfactory position of financial liquidity, and with these heavy rejections its situation worsened and its debts mounted.. Greatly contributing to its financial distress was the concomitant large decrease it was suffering on its regular heating equipment business.
•70. On September 8,1953, after having made written payment requests for approximately a month, Meriden telephoned plaintiff concerning plaintiff’s indebtedness to Meri-den with respect to deliveries thus far made by Meriden, and generally discussed plaintiff’s financial plight. Plaintiff advised of the pending change order and the increased compensation it would afford, but could give no assurances as to when it would be able to pay Meriden. Consequently, Meriden stated it would cease production. By letter of the same date to plaintiff, Meriden confirmed the conversation, stating, in part:
*743 In onr conversation today, you stated for the first time that you would be unable to make any payment on account of past due invoices and to arrange for payment on future invoices until you received a release for such payments from the EFC. You state that you do not mow when this will occur, since the release of money is tied up with the price revision due to engineering changes; * * *.
In view of the circumstances, it was agreed we could no longer make deliveries and it was further decided to stop all production; if possible, to liquidate our inventory and also to take the necessary steps to protect our interests in this matter. We will resume production when we know from you when your past indebtedness-will be cleared up and when assurances are forthcoming that all future invoices will be paid for promptly.
i71. (a) On September 21, 1953, plaintiff and defendant entered into Supplemental Agreement No. 2 to contract 18702 (the 500,000 tool contract), which incorporated the changes agreed upon at the meeting of August 21st. Prior thereto,, the parties did not reach agreement on the extra amount which plaintiff should be paid. Accordingly, the agreement reflected defendant’s unilateral determination that the price of the tool should be increased $0.11341 per unit (applicable to the 463,500 as yet undelivered units, 36,500 having been accepted), thus increasing the contract price by $52,565.54. Such consideration was made applicable to only three of the changes (including the one involving the metal-to-metal contact controversy). The agreement preserved to plaintiff, however, the right to take appropriate proceedings to obtain a higher increase than that provided for. Plaintiff was claiming an increase in its costs of approximately $0.38 per unit. With respect to the other 16 changes (which included the lightening of the strength test to 335 pounds, the easing of the deflection test, and the broadening of the hardness test, all of which obviously involved no cost increase), no extra compensation was provided for, and no reservation of any right for plaintiff to take proceedings to obtain such extra compensation was preserved.
In addition, a new delivery schedule was “as a result of the delays caused by the changes set forth herein,” provided for the 463,500 tools remaining to be delivered, with the first *744 30,000 to be delivered by the end of November 1953, and the remaining to be delivered at the rate of 60,000 monthly thereafter, the final balance to be delivered by July 31,1954.
(b) On the same day, contract 18704 (the 517,000 tool contract) was similarly amended by a Supplemental Agreement No. 2. In this instance, however, no deliveries had been made by plaintiff against the contract, so that the increased unit price applied to the entire contract amount, the increase amounting to $58,632.97.
The new delivery schedule for this contract provided that the first 50,000 also be delivered during the month of November 1953, and the remaining to be delivered at the rate of 65,000 monthly, with the final balance similarly to be delivered by July 31,1954.
72, Up to the time Supplemental Agreement No. 2 was entered into on September 21, 1953, and counting the last six lots as having been accepted (as they ultimately were), plaintiff had presented 20 lots for inspection and testing on contract 18702, comprising 23,800 tools, of which 15,200 were accepted and 8,600 rejected. Thus final rejections (even after re-screenings and re-testings) represented over 36 percent of the number of tools inspected and tested.[1] These 20 lots were all presented and inspected between August 6, 1953, and September 4, 1953, the tools presented prior to August 6, 1953, having been allocated to contract 18703. (No tools were presented on contract 18704 until April 1954.)
The tools rejected were due to fractured hinges at the base of the lobes and fractured blades on the lot samples tested. As is set forth in finding 66(b) concerning the rejections on contract 18703, it is reasonable to conclude that at least a contributing factor in causing the fractures was the forcing of the center rivet connecting the hinge to the blade at their depression points. The pick-washer clearance and pick-blade interference problems may also have been contributing factors in strength test failures.
.73. By letter of September 30, 1953, to plaintiff, the contracting officer explained to plaintiff why four of the items *745 proposed by plaintiff in its letter of July 25, 1953, and discussed at the August 21,1953, conference, were not included in Supplemental Agreements No. 2. The letter stated that the four proposals in question (one of which was the dimension of the chamfer on the hinge pin) were not deemed necessary for such inclusion but that, if plaintiff used the dimensions specified in its proposals for such four items, no objection would be raised by defendant.
i74. Many of the complaints leading up to the Supplemental Agreements No. 2 grew out of the rather wide tolerances permitted by the specifications. The R&D Division was primarily interested in a good, workable, end item, and felt it would permit flexibility within broad tolerances in the method of manufacture. However, when components have to fit precisely into working parts, the allowance of too broad tolerances is in itself not good practice, in that individual components may be manufactured (possibly by separate subcontractors) within the permitted tolerances and therefore in compliance with the drawings and specifications and yet, when assembled, may not function as a satisfactory end item. Thus, the holes in each of the hinge, pick, and socket components could each be fixed within the range of the permitted tolerances, and yet, when put together for the insertion of the pin, it could foe that they would not be so aligned as to permit such insertion. Many of the items specified in the Supplemental Agreements No. 2 were designed to tighten up the dimensions.
Even as to the hinge-blade metal-to-metal contact problem, defendant contends that, if plaintiff took advantage of the %2-inch tolerance, adding a permitted dimension to the hinge and deducting a permitted dimension from the blade, metal-to-metal contact could have been achieved within the original drawings and specifications and without the necessity of any supplemental agreement (i.e., % or %2-inch blade depression, less %2-inch tolerance, equals %2 inches; %6 or %2-inch hinge depression, plus %2-inch tolerance, equals %2 inches). While this Would, of course, be possible, and while an extremely able and experienced shovel contractor might have been able to so diagnose and solve the problem by manufacturing to precise dimensions within permitted tolerances, *746 such procedure is not considered normal and the drafting of drawings and specifications with such possible manufacturing techniques in mind is not good practice. Such procedure would destroy the very purpose of a tolerance. The component parts should normally fit into a satisfactory end item whether they come out with a low or high tolerance. One of the principal purposes of a tolerance is to make some allowance for inevitable slight dimensional changes which result from the heat treating (and subsequent cooling) process.
The change of the %-inch blade dimension to %@-inch, which was the first change made in the supplemental agreements, and which was one of the three changes for which defendant gave plaintiff substantial increased compensation, as set forth above, must be deemed to have constituted an error in the original drawings.
The second of the three changes for which defendant granted extra compensation related to the location of the hole on the pick in relation to the pick ears. The location, as newly specified, was within the original tolerance, 'but was pinpointed more exactly. This enabled the pick, in the folded position, to lay flat against the handle or, when in the using position, to be 90° to the handle. The lack of a specific dimension or location of tins hole under the broad tolerances permitted a number of dimensions which would not, however, allow the completed tool to function as required. Only an exact measurement would permit this.
The. third item for which payment was made corrected a drawing which contained an obvious error (a dimension was specified as 14-inch which should have been 114 inches) and which made another change designed to assure clearance between the blade and the ears of the pick during the folding operation, thus curing the pick-blade “bite” or interference problem. Here again, the exact dimension specified was within the original permissible tolerance.
Most of the other dimensional changes for which no payment was made were of a similar pinpointing variety within already permissible tolerances. One item was designed to eliminate the problem of washer clearance in the pick. Another permitted thicker sockets, since plaintiff’s one-piece tubing was running thicker than the rolled flat steel *747 which the specifications originally had in mind. This change was solely for plaintiff’s benefit. (Although defendant admitted that one-piece socket tubing resulted in -a better ultimate product than sockets made of welded rolled flat steel, the use of such tubing was neither requested nor sought by defendant, since it was considered unnecessary for the purpose. Thus, defendant was merely the beneficiary of a change proposed by plaintiff for plaintiff’s (Meriden’s) •own benefit.)
All the test changes, for which no payment was made, resulted in less stringent requirements. The Eockwell hardness tests on the pick and the socket were permitted to have broader ranges. As to the tubing socket, trouble was encountered in obtaining accurate hardness readings, for which absolute stability in testing is a prerequisite. For rounded items, special fixtures to hold them steady and rigid are necessary. Plaintiff had no such special fixture, although one could have been designed and made at relatively minor cost. In any event, plaintiff was granted an additional range to alleviate this problem, and thus eliminate •the need for special holding fixtures. In addition, the specification was amended so as to specify the exact point on the socket where the Rockwell test should be applied. Other test relaxations were the abandonment of the requirement for 100 percent testing on the picks as component parts and, as hereinabove noted, the reduction of the strength test requirement to 335 pounds.
Assuming that defendant would not lower the standards or the efficiency of this important combat tool merely to aid this plaintiff, the conclusion is compelled that the relaxed .standards provided by. this supplemental agreement, including the strength test, reflected a studied decision by defendant’s officials, based on the experience thus far gained on this first large-scale production of the intrenching tool, that the original test requirements had been too stringent.
/75. (a) The dimensional changes put into effect by Supplemental Agreements No. 2 necessitated the re-working by Meriden of some of its dies and tools and, in some instances, complete re-tooling. Meriden refused to undertake such additional expense unless its past due accounts were paid. *748 Consequently, Meriden continued the suspension of all further production on its subcontracts. Said suspension had commenced on September 8, 1952 (finding 70).
(b) With no further deliveries of component parts forthcoming from Meriden, plaintiff too was required to cease its operations. Plaintiff’s fully manned assembly line had 35 employees. Plaintiff closed down its line and released the employees.
76. On October 19, 1953, the April 1, 1954 maturity date of the second RFC loan was, at plaintiff’s request, extended to November 1, 1954. This was the second such extension. On this same date, $175,000 of the original $500,000 loan authorization was cancelled, thus reducing the authorization to $325,000.
77. (a) By letter of October 20, 1953, plaintiff appealed, under the disputes clauses of the contracts, the amount of the compensation allowed it under Supplemental Agreements No. 2. However, this appeal was never pursued by plaintiff.
(b) The disputes clause of both contracts read as follows r
12. Disputes
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive: Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
78. Although it continued to suspend actual production operations, Meriden decided to get its dies and tooling in *749 shape so that it would be in a position to re-commence production if and when plaintiff made satisfactory financial arrangements with it. However, on October 30, 1953, Meri-den’s pick-forming die became damaged to such an extent that it was necessary to obtain a new one. This die did not become available until the end of November 1953. In the meantime, Meriden, for such pick-die reason, as well as because of the financial situation, engaged in no component part production, thus still preventing plaintiff from making any further deliveries of completed tools during such period.
i79. On November 1, 1953, plaintiff’s secretary-treasurer ■died, causing a temporary disruption in plaintiff’s business affairs.
80. By November 11, 1953, all production was still suspended. On that date, plaintiff, in a letter to Northern, its handle supplier, with respect to plaintiff’s past due accounts, and in response to numerous letters from the supplier requesting payment, stated in part:
* * * [W]e could not produce any tools until the die had been repaired and then a certain length of time would have to elapse, perhaps a week or ten days, before we would have sufficient parts to make the first shipment. Following this, the papers have to go through their normal course and are cleared and then funds become available to us.
As you know, all of our planning was done on the basis of moneys being paid against shipments and no other way. * * *
At this writing, I can say to you * * * that the die is coming along on schedule, apparently, and unless unforeseen difficulties are encountered, we should be getting samples Saturday or Monday next. We hope and pray the samples will be what we have to have. If not, a few more days will have to be spent in dressing the die. As soon thereafter as humanly possible we want to get a quantity of these, have them heat treated, and then we’re back in business again.
81. (a) On November 24, 1953, plaintiff, by letter to defendant, requested an extension of time of 30 days in its delivery obligations. Under the new delivery schedules fixed in Supplemental Agreements No. 2, the first deliveries thereafter (80,000 tools) were to be made by November 30,1953. *750 Plaintiff urged that the death of its secretary-treasurer and the breaking of the pick-forming die be considered as the basis for an excusable delay for such period. As to a second source of supply which would make plaintiff not dependent solely on Meriden, plaintiff stated it would not have been feasible to obtain such a source prior to September 21,1953, when Supplemental Agreements No. 2 were issued, because the changes involved “affected existing dies” and “it was felt foolhardy to have any other source working on dies or parts until the changes were authorized.” Plaintiff stated, however, that it was “currently completing negotiations with a second source of supply.” Plaintiff further stated that “it was more than 30 days after the change orders were issued that our financing could be re-established and funds again made available to sub-contractors”; and that “we feel very strongly that we stand in a better position by far, today, to produce acceptable tools, in quantity, than at any other time during the tenure of these contracts.”
Following this request, QM representatives, on November 30 and December 1, 1953, visited plaintiff’s plant and discussed with plaintiff’s officials the entire status of the contracts. A further conference was held on December 8,1953, at QM in Chicago. As a result, the contracting officer on that day handed to plaintiff’s president a letter dated December 8,1953, which granted plaintiff’s request for a 30-day extension. The letter stated that the 30 days’ delay for the reasons given by plaintiff was “excusable” and:
Accordingly, the undersigned Contracting Officer considers that your contract not to be in a delinquent status as of this date and that the deliveries during the period 1 to 30 November 1953 heretofore required under supplemental agreement No. 2 to subject contracts, will now be required during the period 1 to 31 December 1953.
(b) As a result of the letter of December 8, 1958, the new schedule called for 30,000 tools to be delivered by December 31, 1953, on contract 18702, and 60,000 monthly thereafter; and 50,000 to be delivered by December 31, 1953, on contract 18704, and 65,000 monthly thereafter.
82. By December 19,1953, Meriden was again prepared to proceed with its subcontracts but refused to do so utOp-ss *751 satisfactory financial arrangements could be made for the payment of its bills. Despite plaintiff’s failure to- clear up its unpaid accounts, Meriden bad gone ahead and put its dies and tooling in such shape as to enable it to proceed. On that day its president (Townshend) conferred with plaintiff’s officials about the unpaid bills. At that time, all performance of contracts 18702 and 18704 was still at a. standstill. Among the matters discussed was a possible assignment by plaintiff of the entire contracts to Meriden. After plaintiff’s president stated that plaintiff’s financial position was such as to prevent it from proceeding further with the performance of the contracts at that time, Meriden refused to proceed with operations on its subcontracts.. On December 21, 1953, Meriden’s president telephoned the Chicago QM Depot to advise its officials of his conference with plaintiff’s president and of the status of the contracts.
Thus, Meriden’s operations under its subcontracts had remained suspended since September. As a result, Meriden, had laid off all of its personnel who had been engaged on. such operations.
S3, Evidently as a result of Meriden’s report to QM (finding 82), QM requested plaintiff to set forth its intentions-concerning the contracts and its capability of performing them. Under the new delivery schedule, plaintiff was obligated to deliver, under the two contracts, 80,000 tools during the month ending December 31,1953 (finding 81 (b)). However, no production at all occurred during December. By-letter of December 26,1953, to QM plaintiff set forth its then position on the contracts and urged defendant to permit it to continue. It stated that after Supplemental Agreement No. 2, which “is virtually a new contract, we immediately tookr steps to retool as required by the revised dimensional changes * * ; that, to obtain funds for this purpose, RFC required the preparation of detailed data which took plaintiff' 32 days to prepare, following which 60 days were required to retool, making a loss of time of 92 days; and that RFC' was now refusing to advance further funds because of plain *752 tiff’s being in default on its contract delivery schedule. The letter continued :
Equipment-wise our own bouse is in order and with the conditions existing as outlined above, we know that today we stand in the best position we have ever been in during the tenure of these contracts to produce acceptable Intrenching Tools in quantity and with a far lesser amount of rejections than we have experienced in the past — we believe something approximating 3% to a maximum of 5%.
The letter further stated that, if plaintiff were cleared of its delivery default, thus enabling it to receive further funds from EFC, “we are assured our suppliers will furnish the quantities of components needed * * *”; that Meriden had so assured it in a conference on December 24, 1953, and Northern Handle in a telephone conversation that very day; that, in any event, plaintiff would negotiate with two additional sources of supply for the four Meriden components and for the handle; that, as to labor, the seasonal peak (September, October, and November) in plaintiff’s “basic business, the manufacturing of heating equipment” now being over, plaintiff’s employees could be shifted to the tool contracts and sufficient labor was available for “rehiring” in the Springfield area, if needed; that “the major bottleneck in the past has been the quantities of picks that we have received,” but that Meriden’s “new pick blanking die is completed and is ready for production”; that Meriden assured it could ultimately produce 4,000 picks a day, together with an equal number of the other parts, and that on that basis plaintiff would be able to produce 60,000 tools a month from Meriden’s components alone, and, with additional sources of supply, 125,000 per month. Plaintiff sought “an excusable delay to and including February 28, 1954” so as to be able to work out the proposed program. Plaintiff concluded by saying:
To summarize our position, you are advised that if immediate favorable action, not later than December 31st, is taken on our request and we are given an excusable delay until 28 February 1954, together with the revised schedule requested, this will enable us to procure the necessary financial assistance to complete this con *753 tract. We are in the best position now that we have ever been in to produce acceptable tools in quantity. _ The aforegoing, m turn, will enable us to remain in business, to meet our obligations, help our suppliers to continue in business, and to supply the contract items to the Government on schedule.
¡84. On December 28, 1953, plaintiff’s representatives conferred with defendant’s QM officials at Chicago about the continuation of the contracts and, by letter of December 29, 1953, to QM at Chicago, plaintiff further clarified its position, stating, in part:
In our discussion yesterday at your office, it was stated by Lt. Col. R. L. Ely that action on this matter on or before December 31st would not be possible. To clarify our position as quoted, you are advised that what we are seeking is an excusable delay of approximately sixty days, based on our need for approximately five months’ lead time to re-tool and set up for this job (this is equivalent to our planned lead time in our original contracts). * * *
*****
May we again emphasize that favorable action is necessary if a critical situation is to be avoided by this company. Favorable action would avoid a critical situation for our subcontractors, Meriden Industries and Northern Handle Mills, and also would save the investment which the Reconstruction Finance Corporation has in this contract. We feel certain, too, that it would be to the advantage of the Government to honor our request for the reason that the issuance of a call for new bids would probably entail an increase in price, with no prospect of obtaining from us any damages which might be caused by the issuance of a default of our contráete. We feel we should call these things to your attention, which, while in your view they may not have anything to do with the legalities of the problem, certainly would work a detriment to the Government and to the contractor and. subcontractors. In other words, if the Government will cooperate in this request, it would do better than it would otherwise by resorting to legalities.
85. On December 31, 1953, plaintiff and Meriden agreed upon arrangements whereby Meriden would resume production of the four component parte provided plaintiff made nayment of Meriden’s invoices within 14 days. Assuming *754 it could persuade QM and NFC to permit it to proceed with the contracts, plaintiff envisaged an accelerated invoice handling procedure whereby payment of funds to it through the QM and NFC processes would be made in sufficient time so that it in turn could make payment to Meriden within such 14-day period.
86. For the year 1953 plaintiff suffered an enormous loss of approximately $222,000. Its total sales fell to approximately $1,485,000, with its civilian sales falling sharply to approximately $1,160,000. As of December 31, 1953, its financial condition had badly deteriorated. Its current liabilities exceeded its current assets. Its working capital position was now a deficit figure of over $38,000. Its current asset ratio fell to .91.
87. On January 29, 1954, the November 1, 1954, maturity date of the second EFC loan was, at plaintiff’s request, again extended to January 15, 1955. This was the third such extension.
88. By January 31,1954, plaintiff again was delinquent on its delivery schedules under both contracts as revised by defendant’s letter of December 8, 1953 (finding 81(b)). A total of 80,000 tools had been due during the month of December 1953 on both contracts, but plaintiff had shipped only 10,000 on contract 18702. On both contracts 125,000 were due during the month of January 1954, but no tools at all were even presented for inspection that month. Thus, by the end of that month, plaintiff was again delinquent on both contracts to the extent of 195,000 tools.
To avoid its being declared in default, and as a basis for a further revision of the delivery schedules, plaintiff offered to produce the remaining tools to be delivered at a price reduction of approximately six-tenths of a cent per tool ($0.00621). Defendant accepted this offer, and on February 17, 1954, the parties executed Supplemental Agreement No. 4 to contract 18702 and Supplemental Agreement No. 3 to contract 18704, consummating this arrangement. The former provided, with respect to the 469,994 tools then remaining undelivered, that “it has been determined to be in the best interests of the Government to permit the contractor to continue performance of subject contract and to revise and *755 extend tbe Schedule of Deliveries * * * in consideration of [which] the Contractor has offered to reduce the unit price of the 469,994: undelivered Intrenching Tools in the amount of $.00621 per unit * * Under the new delivery schedule, plaintiff obligated itself to deliver 15,000 tools on this contract during the monthly period March 16, 1954r-April 15, 1954, 25,000 during the next month, 30,000 during the next, 40,000 during the next, 55,000 during the next, and 62,500 monthly thereafter, with the balance of 54,994 due by the end of the final period, January 15,1955.
Supplemental Agreement No. 3 to contract 18704 had similar provisions. No tools at all had been delivered with respect to this contract as of February 17,1954, the date of the supplemental agreement, so here the reduction applied to all 517,000 tools. The new delivery schedule'was identical with that set forth above with respect to contract 18702, except that the final balance to be delivered by January 15, 1955, amounted to 102,000 tools.
89. (a) Production operations finally resumed in February 1954, when Meriden again commenced shipping component parts to plaintiff. In February and March 1954, plaintiff made complaints to Meriden concerning unbalanced shipments. For instance, by letter of February 19, 1954, to Meriden, plaintiff complained about a shipment which contained 1,500 blades and hinges, but only 500 sockets and 235 picks and stated: “* * * we must insist that * * * you send us equal quantities of all four parts.” And by letter of March 1, 1954, plaintiff informed Meriden that the chief complaint of NFC (which was giving increasing attention to plaintiff’s performance under its tool contracts) “is that our inventory of parts is unbalanced * * However, as shown by plaintiff’s letter of April 6,1954, to the RFC, which set forth the quantities of each part shipped for each week since production was resumed during the week ending February 20, 1954, as of the week ending April 3, 1954, the situation was somewhat rectified. By that time Meriden had shipped approximately 28,000 sockets, 26,000 picks, 28,000 blades, and 20,000 hinges. Yet these numbers were far below the amounts required to enable plaintiff to fulfill the *756 120,000 monthly tool delivery obligations of the two remaining contracts.
(b) With the resumption of production, Meriden instituted in its plant a more rigid system of inspecting the quality of its own products prior to Government inspections. It established a quality control system which was similar to defendant’s sampling inspection and test methods. However, because it was based on the sampling technique, some Government rejections still occurred. Nevertheless, the ultimate rejection rate was much lower after the institution of this rigid control system. Similarly, plaintiff itself .had instituted a tighter inspection system of its own in an attempt to make certain the tools were satisfactory prior to presenting them to defendant’s inspectors.
SO. Shortly prior to April IB, 1954, the state of plaintiff’s financial affairs was such that a creditors’ meeting was arranged. Notices were sent to all creditors concerning tMs meeting. On or about the same date the RFC suspended advancing further funds to plaintiff. This made it impossible for plaintiff to make payments on its indebtedness to Meriden.
91. (a) Plaintiff, as of April 13, 1954, had paid Tucker $11,000. By letter of that date, Tucker complained to plaintiff that he had not received notice of the creditors’ meeting and that “you will certainly have to admit that I am a creditor.” The letter went on to state:
When I talked to Mr. Shaw yesterday he pointed out that I am regarded as an employee of your company. However, my attorneys state that my employment contract with you gives me a preferential standing over and above the status of an ordinary employee.
Under Paragraph 2 of my contract with you (2/15/ 52) you will find monies due me is governed by this paragraph, and in particular, that part of the contract paragraph which reads, “weekly dollar value of deliveries as required by the customer”.
The customer required deliveries far in excess of those made, * * * and your failure to make deliveries does not alter funds due me as provided by the above paragraph, and also Paragraph 4 of the said contract.
To date you have paid me $11,000. against a total due me of $39,479., or a balance due of $28,479. as of this date under the terms of my contract with you.
*757 Since you have never contested my letter of October 7, 1952, * * * I must insist on being considered as a major creditor. Unless I have this recognition by you immediately, I will have to turn the matter over to a Springfield attorney with instructions to proceed with legal action without delay to protect my interests.
Your immediate reply is mandatory.
(b) By letter of April 21, 1954, plaintiff forwarded to Tucker a copy of the general notice that had been sent to all plaintiff’s creditors and requested that Tucker submit the amount of his claim against plaintiff for presentation “to the Creditors’ Committee at their next meeting.” The record does not disclose whether Tucker ever received any payments in addition to the $11,000.
92. On April 20,1954, Meriden again discussed with plaintiff the problem of its unpaid bills and was informed by plaintiff that, for the present, RFC had decided not to advance additional funds to plaintiff for the continuation of the tool contracts. Accordingly, by letter of April 21,1954, Meriden advised plaintiff, “We find ourselves in a position where we will have to suspend shipments until some suitable plan can be worked out.” Thereupon, Meriden again temporarily ceased further shipments to plaintiff.
93. Under the revised delivery schedule, by April 15,1954, plaintiff was no longer delinquent on contract 18702 and only 7,500 tools delinquent on contract 18704. However, with the refusal of Meriden to make further shipments and the suspension of loan funds by RFC, plaintiff was again faced with large deficiencies in its delivery obligations. By May 15, 1954, it was obligated to deliver 50,000 more tools on both contracts. By letter of April 27, 1954, to defendant plaintiff advised that:
Inasmuch as our financing agency — the Reconstruction Finance Corporation — without advance notice to us, withheld sizable funds some two weeks ago, we have not found it possible to pay certain sub-contractors— and this in turn has held up deliveries of vital components. The possibility therefore exists that we may not be able to complete and ship the total quantity of 50,000 by May 15.
94. In March, April, and May 1954, the RFC sent one of its employees, an industrial and mechanical engineer, to *758 plaintiff’s plant to investigate whether there were engineering deficiencies which were causing plaintiff’s continual delinquencies in the deliveries under the two contracts. Included in the data plaintiff was furnishing RFC were weekly reports of the amounts plaintiff owed to each subcontractor. In the course of his investigations, the engineer also visited Meriden’s plant. He concluded that Meriden did not have the capacity to deliver components to plaintiff in sufficient quantities to meet plaintiff’s delivery dates. Among other things he was critical of the high rate of rejection of plaintiff’s sockets before they were incorporated in the assembled tool, the rejection rate running approximately 20 percent, and was advised of a change Meriden was proposing to make in its basic method of manufacturing the sockets. On May 6, 1954, in the company of an official of plaintiff, the engineer visited and approved a possible second source of supply for the component parts (Burlington Industries).
95. During May 1954 Meriden, after further negotiations and arrangements with plaintiff, again proceeded with production of component parts. However, it decided to change its method of manufacturing the socket from the hot to the cold rolling or forming method. The previous method produced too many sockets which failed to meet the specifications, resulting in many unusable parts. The hot forming process may produce problems of adherence to dimensional requirements because sometimes dimensions are altered in the cooling processes. There is, therefore, less dimensional variation inherent in the cold forming process.
During the changeover, production of sockets ceased from early May to about the end of June 1954, causing a serious disruption of the entire production program.
96. (a) By letter of May 19,1954, plaintiff requested QM to extend the delivery schedules by approximately 5 weeks. It stated, in part:
You will be interested to know that despite the chaos created by the withholding of funds, we shipped one car of 8320 tools on May 7th and are shipping another car of 8320 tools today.
You will be further interested to know .that during this time of uncertainty our supplier, Meriden Industries, who had been working on another method of *759 manufacturing tbe sockets, took the. opportunity to try out the new method in production, and this has exceeded our expectations. The net result is better production, much superior quality of product, and hence a minimum of rejections; in fact, far below anything we had anticipated.
In addition to this, we have another subcontractor, Burlington Industries Inc., St. Mihiel Drive, Riverside, New Jersey, all set to fabricate hinges, picks, blades and sockets just as soon as we give him the go ahead. This will be done immediately on our being assured that the overall picture warrants our obligating them.
We request you grant us the extension of our schedule as above outlined by telegram as soon as possible.
No arrangement with Burlington Industries, or with any other second source of supply, ever materialized.
(b) By letter of June 18, 1954, the contracting officer, noting that plaintiff was then in default on both contracts to the extent of 93,860 tools, denied plaintiff’s request. He stated that delays attributable to “inability to secure adequate monies to finance production of the contracts * * * do not constitute an excusable cause for delay within the meaning of the Default article of the contracts,” and that unless plaintiff demonstrated, within 30 days, its ability to make substantial deliveries and to “secure adequate financing to satisfactorily continue performance in accordance with the contracts’ schedules, the Contracting Officer will have no alternative but to terminate the subject contracts for default.”
97. In the period June 16-July 15,1954, plaintiff was obligated to deliver 30,000 tools on each contract. However, it delivered only 15,260 on contract 18702 and 8,360 on contract 18704, so that, as of July 15,1954, its combined delinquency on both contracts grew to 149,740 tools. By letter of July 16, 1954, to defendant, plaintiff advised that the RFC had agreed to extend aid to plaintiff until August 20,1954, when it would again review the matter, and urged defendant to grant the delivery time extension it had previously requested. Further, by letter of July 21, 1954, plaintiff advised the contracting officer that it was planning to augment its subcontracting facilities for the four major components and that it anticipated shipping 50,000 tools in the period July 20 to August 20, 1954; 60,000 in the next monthly period, and 80,000 in the *760 next. In addition, plaintiff requested assistance in obtaining blade stock steel for Meriden since Meriden’s supplier, Acme Steel, planned to shut down for 2 weeks for its annual vacation period. Plaintiff had previously, on July 16, 1954, telephoned the contracting officer about the steel problem and, by letter of July 19, 1954, the contracting officer informed plaintiff that he had attempted to expedite the steel deliveries, but that:
Acme Steel Company advised that Meriden Industries telephoned them on 28 June 1954 requesting shipment of 50 tons of blade stock and again on 16 July 1954 regarding this shipment. Meriden Industries was advised that Acme Steel Company would shut down for a vacation beginning the 19th of July 1954 and it would be virtually impossible to make any shipment prior to the week of 23 August 1954. Acme Steel Company further advises that the orders for this material were originally placed with them on 21 August 1952 and 22 April 1953 and that they had experienced great difficulties in getting Meriden Industries to accept shipments.
This office stands ready to assist Contractors by expediting delivery of needed materials at any time, how-evei’, in this instance plans for ordering required steel Should have been made sufficiently in advance to assure deliveries in time for production.
98. (a) On August 13, 1954, the contracting officer sent to plaintiff, with respect to contract 18702, a “Notice of Partial Termination For Default.” The letter noted that under the February 17, 1954, delivery schedule 70,000 tools were to be delivered by June 15, 1954, but plaintiff had delivered only 15,000; that, by plaintiff’s own admission, the cause of plaintiff’s delay was its inability to secure adequate funds to finance the production; that, by defendant’s letter of June 18, 1954 (finding 96(b)), it had warned plaintiff of default action if substantial deliveries were not made in 30 days; that since then plaintiff had delivered only 15,260 of the 110,000 scheduled; that plaintiff’s proposed deliveries as set forth in its letter of July 21, 1954 (finding 97) would still leave it in default on plaintiff’s two contracts, as of October 15, 1954, by an additional 170,000 tools; and that the RFC’s willingness to continue its financing arrangement only until August 20,1954, at which time the matter would be further *761 reviewed, was not regarded as sufficient assurance of adequate financing. The letter then declared plaintiff in default and terminated plaintiff’s right to proceed with further performance as to a total, however, of only 164,740 tools. This figure was obtained by allowing the February 17, 1954, delivery schedule (finding 88) to stand as to the last 3 months ending J anuary 15, 1955 {i.e., 62,500 for each of the months ending November 15 and December 15,1954, and 54,994 for the month ending January 15, 1955), but cutting back the April 15 and May 15, 1954, quotas (15,000 and 25,000, respectively) to the amounts that had actually been delivered (15,000 and 15,260, respectively), the June and July 15, 1954, quotas of 30,000 and 40,000 respectively, to zero, and the August 15, September 15, and October 15, 1954, quotas (55,000, 62,500, and 62,500, respectively) to 25,000, 30,000, and 40,000, respectively. This readjustment resulted in the elimination of 164,740 tools from the contract, reducing the original total contract amount of 500,000 tools to the new total of 305,254.
(b) On the same date the contracting officer issued a similar notice of partial termination under contract 18704. This notice stated that, on this contract, 70,000 tools were to be delivered by June 15, 1954, but as of that date only 31,640 had been delivered, and that since then only 28,360 of the required 110,000 had been delivered. A similar readjustment of the quantities to be delivered was made. The February 17, 1954, delivery schedule was retained as to the last 3 months ending J anuary 15,1955 {i.e., 62,500 for each of the months ending November 15, and December 15, 1954, and 102,000 for the month ending January 15,1955), but the June 15, 1954, quota of 30,000 was cut back to 20,000; the July 15, 1954, quota of 40,000 to zero; and the August 15, September 15, and October 15 quotas (55,000, 62,500, and 62,500, respectively) to 5,000, 30,000, and 40,000, respectively. This readjustment resulted in the elimination of 155,000 tools from the contract, reducing the original total contract amount of 517,000 tools to the new total of 362,000.
09. On September 17, 1954, plaintiff, under the disputes clauses of its contracts, filed an appeal to the Secretary of the Army from the partial termination actions of the contracting officer. Plaintiff claimed the terminations were *762 wrongful because its delays were excusable “in that improper, incorrect and incomplete specifications and drawings were furnished with the contract at the time of its execution by the contractor”; that the delays were caused by defendant “in negligently failing and refusing to correct the erroneous drawings and specifications after repeated requests to do so. •Included in this, but not excluding other factors, was the denial by the Contracting Officer of repeated requests, both verbal and written, that- permission be granted to the Contractor’s personnel to visit and consult with personnel of the Research and Development Branch of the Office of the Quartermaster General, then located at Jeffersonville, Indiana, for the purpose of obtaining corrections of the said drawings and specifications.[2] This one action alone delayed the obtaining of obvious and necessary engineering changes for more than one year”; that the inspectors, through their “ignorance, misuse of authority and non-cooperation,” caused “harassment” of plaintiff resulting in “unreasonable rejections * * * delay and financial loss”;[3] that the QM at Chicago caused “further harassment” of plaintiff “in insisting that [plaintiff] perform its contract when they knew or should have known that performance thereunder was impossible because of the obvious errors in the drawings and specifications”; that the aforesaid “actions by the Government have resulted in a serious depletion of the Appellant’s financial resources. This, among other factors, has impeded production under the contract”; that QM “imposed upon the Contractor production schedules which they knew or should have known were unrealistic [4] and which the contractor ac *763 cepted through fear of termination with its consequent tremendous financial loss; and which the Contractor further states constituted a form of coercion”; and that plaintiff executed the supplemental agreements containing reduced prices “because of the aforesaid coercion” by QM, which agreements “were imposed upon the Contractor for the purpose of foreclosing the Contractor from asserting any claim * * * due to the negligent failure and refusal of [QM] to act upon the request for the necessary and obvious changes in the drawings and specifications.” Among other things plaintiff requested that it be found “that the instant' contract was in essence a research and development contract.”
100. In the meantime, plaintiff continued with the performance of the contracts. As of August 15, 1954, it was, under the new schedules set forth in the notices of partial termination, delinquent on 'both contracts to the extent of only 30,000 tools, a total of 120,266 tools having been delivered prior thereto. However, for the monthly period ending September 15,1954, only 29,740 tools were delivered, raising plaintiff’s delinquency to 60,260. For the monthly period ending October 15, 1954, 40,000 tools were delivered, raising plaintiff’s delinquency to 100,260. For the monthly period ending November 15, 1954, 32,500 tools were delivered, raising plaintiff’s delinquency to 192,760. During the monthly period ending December 15,1954,32,760 tools were delivered, increasing plaintiff’s delinquency to 285,000. And during the final month of the then outstanding delivery schedule ending January 15,1955, 30,000 tools were delivered, making plaintiff’s delinquency 411,994.
101. In the latter part of 1954, plaintiff took over from Meriden the fabricating of the blades. This was done for two reasons:
(a) The steel for the four components Meriden was manufacturing was being purchased from the Acme Steel Company. From the beginning, Acme desired Meriden to accept at one time all the steel for the entire contract. However, with its limited storage space and financial resources, Meri-den insisted on smaller shipments scheduled on a quarterly basis. Although Acme consented to make partial deliveries, Meriden sometimes found it difficult to obtain the steel when *764 it needed it. While Meriden might have been ready for a shipment, Acme at that particular time might not be able to work Meriden’s order into Acme’s production schedule. The steel for the blade was a special sheet of hot rolled strip. As a practical matter, Meriden found that Acme was the only steel company that was willing to supply this special steel in the quantities required — a relatively small quantity for a steel mill.
(b) At this time in 1954, Meriden itself had severe financial difficulties. It wished to be relieved of the obligations involved in taking in large amounts of steel for future manufacturing operations.
As a result, Meriden sold to plaintiff the dies and tools for the making of the blades and plaintiff thereafter undertook the blade fabrication. However, Meriden still continued to manufacture the pick, hinge, and socket.
102. On December 81, 1954, the January 15, 1955, maturity date of the second NFC loan was, at plaintiff’s request, extended to July 15, 1955. This was the fourth such extension.
103. For the year 1954, plaintiff suffered another large loss of over $181,000. Its total sales fell to approximately $1,387,000, with its civilian business falling to approximately $880,000. For the first time in many years it made no retail sales at all in its heating equipment business. In 1951, such sales had amounted to over $470,000; in 1952, to over $467,000; and, in 1953, to over $344,000. As of December 31, 1954, plaintiff’s deficit in working capital increased to over $97,000 and its net worth fell to approximately $158,000. Plaintiff’s current asset ratio fell to .75.
The following chart summarizes plaintiff’s losses and decline in business from 1951 through 1954:

*765 104. As shown, upon the expiration of the then delivery schedule on January 15, 1955, plaintiff was delinquent on both contracts to the extent of approximately 412,000 tools (finding 100). On January 25, 1955, a representative of pln.iut.iff and plaintiff’s attorney (Begley) conferred with QM officials at Chicago. The attorney stated that a group of qualified and financially responsible businessmen was considering taking over the plaintiff and continuing with performance of the contracts provided defendant would extend the delivery dates; that, as consideration for such extension, the new group would withdraw plaintiff’s pending appeal on the partial terminations, waive all claims against defendant, consider a price reduction, and withdraw the duress allegations that had been made. Reinstatement of the terminated quantities was requested, but not made a condition of the offer. Plaintiff’s representatives were advised that their proposal would be considered if presented in writing. Plaintiff’s representatives stated this would be done in 10 days.
105. (a) On February 9, 1955, a representative of plaintiff conferred in Chicago with the contracting officer (Morris) and other QM representatives and advised that the tentative proposal discussed at the January 25,1955, conference had not materialized but that plaintiff’s attorney was now working on another plan which would be presented to defendant around March 1, 1955; that plaintiff was showing much progress, having already shipped 20,000 tools that month, with more to come;[5] and that plaintiff had commenced working on a claim it intended to present which was, as of December 1958, in the amount of approximately $200,000. Plaintiff was informed, however, that while plaintiff’s recent performance was better, it nevertheless was in default and that a 10-day default notification letter would be sent.
(b) On February 10, 1955, the contracting officer served plaintiff with a notice of default and gave plaintiff 10 days within which to demonstrate its capability of effecting substantial deliveries within 30 days as well as to furnish *766 evidence that it could secure adequate financing. By letter of February 16, 1955, plaintiff requested a conference to discuss the contracts. This request was granted and a conference was held on February 24, 1955. As a result, plaintiff made a proposal for the continuation of the contracts, which proposal was embodied in a letter of the same date as follows:
(1) That the contractor withdraw its appeal based upon your Notices of Default, dated 18 August 1954.
(2) That the contractor forego any claims it may have by reason of prior contracts between the parties, and that the contractor further will covenant not to sue the Government by reason of any claim it may have, actual or potential based thereon.
(3) That the unit price of the item be reduced by 1/2‡ for the balance of the deliveries due under subject contracts, beginning with a date to be agreed upon.
(4) That the Government on its part will include in such new contract or contracts, a delivery schedule requiring a minimum delivery of 30,000 units per month, with the contractor having the right to anticipate deliveries in excess of said minimum, which excess would be applied against subsequent monthly deliveries which may fall'below the said monthly requirements of 30,000 units.
Plaintiff further stated that the Defense Lending Division (DLD) of the Treasury Department (the successor to the RFC) would continue financing the production, provided the contracts were not in default; that the creditors’ committee, in whose hands the company had “informally” been for about a year, would continue to cooperate “if we can assure them of a rearrangement of the contracts as herein proposed”; that subcontractors were then being paid on a current basis; that plaintiff had a new handle subcontractor, the Tatem Mfg. Co., which would assure it of a supply of handles and eliminate the trouble it had encountered of obtaining handles from Northern; and that, during February 1955, plaintiff had received around 3,000 components a day from Meriden, which would equal 60,000 a month, and had already shipped 40,000 completed tools that month. Plaintiff further requested that the partial terminations of 319,000 be canceled and that such amount be reinstated to the contracts.
*767 Thus, plaintiff’s principal problem was' obtaining an extension of its delivery schedules which would clear it of its default.
106. On March 9, 1955, another conference was held between six representatives of plaintiff (including attorney Begley) and six of defendant. As a result, an agreement was arrived at and reduced to writing on the same date. The agreement, termed a “Memorandum of Understanding,” and dated March 9,1955, read as follows:
At a conference held on 9 March 1955 in the Office of The Quartermaster General, between representatives of Harvey-Whipplé, Inc., Springfield, Massachusetts, and representatives of the Department of the Army, whose names are set forth in Attachment #1, it was' mutüally agreed that the following terms and conditions represent an offer from Harvey-Whipple, Inc., to the government for an extension and modification of' Contract'Nos. DA 11-009-QM18702 and DA 11-009-QM18704. It is the further understanding that the terms and conditions set forth herein will be set forth in ■ formal supplemental agreements to the aforementioned-contracts to be formally executed at Chicago Quartermaster Depot not "later than 21 March 1955. The terms of the offer by Harvey-Whipple, Inc., and which have been agreed to by the Contracting Officer, informally, are as follows:
1. That the contractor withdraw its appeal, based upon notices of default dated 13 August 1954.
2. That the contractor" forego any cause or causes of action it may have by reason of the aforementioned contracts, change orders, or supplemental agreements thereto between the parties, and the contractor further will "covenant not to sue the government by reason of any claim it may have, actual or potential, based thereon, provided that nothing herein shall be construed as a waiver by the contractor, Harvey-Whipple, Inc., of any cause of action which may arise under its future performance of these supplemental agreements subsequent to the date thereof, provided further that such cause of action shall not be predicated upon or related to anything which may have happened prior to the date of these.supplemental agreements which are to be executed not later than 21 March 195& in accordance with this understanding..,
3. That the unit price of the item 'be reduced by one- *768 half cent for the balance of the deliveries due under the subject contracts (346,994).
4. That the government, commencing on 1 March 1955, will accept delivery of the 346,994 at a rate of not less than 30,000 units per month; the first 30,000 units to be delivered prior to 30 April 1955, with the contractor having the right to anticipate deliveries in excess of said minimum, which excess would be applied only against subsequent monthly deliveries which may fall ■below said monthly requirements of 30,000 units per month.
107. (a) On March 17, 1955, a supplemental agreement, termed Modification No. 8 to contract 18702, was executed incorporating the terms of the Memorandum of Understanding. It provided that the 154,994 tools remaining undelivered on this contract would be delivered as follows: 15,000 by April 30, 1955, and 15,000 monthly thereafter, the final balance of 4,994 to be delivered by February 29, 1956. As “an inducement and consideration to the Government for extending and revising said schedules,” plaintiff agreed to withdraw its Notice of Appeal dated September 17, 1954, to reduce the price of said undelivered tools by one-half cent, and to release defendant as follows:
4. HARVEY-WHIPPLE, INC., does hereby, for itself and its successors, release and forever discharge the UNITED STATES OF AMERICA of and from all and all manner of actions, causes of action, suits, proceedings, debts, dues, judgments, damages, claims and demands whatsoever in law or equity or under administrative procedures which against the UNITED STATES OF AMERICA the said HARVEY-WHIPPLE, INC., ever had, now has or may have for or by reason of any matter, cause or thing whatsoever arising under and by virtue of Contract No. DA 11-009 qm-18702 * * * Contract No. DA 11-009 qm-18703 * * * and Contract No. DA 11-009 qm-18704 * * * from the beginning of the world to the date of these presents, it being the intention and the understanding of the parties that this release and discharge shall apply to but is not limited to (a). any difficulties, conflicts, ambiguities, inconsistencies, discrepancies, or impossibilities which may have been or may be contained in the Contracts No. DA ll-009qm-18702, qm-18703 and qm-18704 and any specifications referenced therein, (b) any upward adjustment in price under the terms and con *769 ditions of Supplemental Agreement No. 2 to Contract No. DA 11-009 qm-18702, dated 21 September 1953 and: Supplemental Agreement No. 2 to Contract No. DA 11-009 qm-18704, dated 21 September 1953, in excess of' $0.11341 per miit and (c) the Notices of Partial Termination for Default, dated 13 August 1954, under Contracts No. DA 11-009 qm — 18702 * * * and Contract-No. DA 11-009 qm-18704 * * *.
5. Except as hereby amended, all the terms and conditions of the contract remain in full force and effect and shall also apply in carrying out the provisions of' this Agreement.
(b) The same agreement, termed Modification No. 6, was-, entered into with respect to contract 18704 on the same day. This agreement applied to the 192,000 then undelivered tools-under that contract and provided that the delivery schedule-should be 15,000 by April 30,1955, and 15,000 monthly thereafter, with the final balances of 25,006 and 16,994 to be delivered during February and March 1956, respectively.[6]
108. On April 26, 1955, the July 15, 1955, maturity date-of the second NFC loan was, at plaintiff’s request, extended' to December 31, 1955. This was the fifth such extension.
109. (a) In March 1955 plaintiff was able to ship 17,50Ch tools on contract 18702 and a like number on contract 18704.. In April 1955 it shipped 12,500 tools on the former contract, but none on the latter. However, considering prior shipments, by the end of April, under the new delivery schedules,, it was ahead on its total deliveries by 17,500 tools, and, by-the end of May, by 2,500 tools.
In June 1955, plaintiff shipped 15,000 on contract 18702,. which met its delivery schedule, and 15,000 on contract 18704,. also meeting its schedule, and again ending the month with., an excess of 2,500.
In July 1955, plaintiff shipped only 10,000 tools on contract: 18702, thus falling behind on that contract by 5,000, but on. contract 18704, it shipped 17,500, or 2,500 more than required. This 2,500, plus the previous 2,500 excess, enabled?. *770 plaintiff to complete tbe month without being delinquent on either contract.
(b) The July 1955 deliveries were the final ones made by plaintiff under the contracts. Financial difficulties continued to plague plaintiff and it found itself unable to pay its subcontractors’ bills. On July 21, 1955, several of plaintiff’s subcontractors visited QM at Chicago concerning their unpaid bills, and subsequently DLD.
J10. The last disbursement out of the NFC cash collateral account was made to plaintiff on July 13,1955. As of such date, the balance due on plaintiff’s second loan authorization of $325,000, against which $324,488.41 was actually disbursed, was $216,362.97, and the balance due on the first loan was $134,402.34.
In total, $1,023,367.80 was received by EFC from the Army (QM) and deposited in the cash collateral account. Of this amount $869,639.13 was disbursed to plaintiff at plaintiff’s request. The ratio of disbursements to the total amount RFC received from the Army is approximately 86 percent, and left a substantial unpaid balance due RFC. Plaintiff was constantly in dire need of cash. Of the total of 56 disbursements made by RFC to, plaintiff from this account, 20 were made on the same date that RFC received the funds from the Army. On the others, the average time for disbursements by RFC after receipt of payment from QM was one week.
111. (a) On July 26, 1955, plaintiff was in default on its RFC loans. However, it was planning to ship 10,000 tools on July 29, and plaintiff decided to attempt to make advance arrangements for the use of the proceeds of the Army’s payments for such tools to clear its default. On that day, plaintiff’s representatives visited the RFC offices in Washington to make such arrangements. After a conference it was arranged that the Army’s check of $19,430.55 for the 10,000 tools would be hand carried to the RFC office by a representative of the plaintiff. The RFC would then immediately, after deducting $5,200 to clear plaintiff’s default on its loans, issue to plaintiff’s representative an RFC check for the balance of $14,230.55. Plaintiff was in desperate straits in its relationships with its subcontractors, and these urgent ar *771 rangements were made not only to stave off a default declaration by RFC, which, would cut off the sole source of plaintiff’s funds, but also to enable plaintiff to obtain as quickly as possible approximately $14,000 with which to make some payments to its subcontractors.
(b)By letter of July 27, 1955, to the RFC, plaintiff confirmed these arrangements, and stated:
4¡ 4* 4¡ ‡ 4*
Plans are going forward as outlined to you, and we trust that favorable results will accrue so that all obligations to your organization as well as other creditors can be liquidated.
112. (a) On July 29, 1955, DLD advised plaintiff by telegram that four of plaintiff’s principal suppliers had notified DLD, and had or would also notify QM and plaintiff, that they would make no further deliveries to plaintiff unless their past due accounts were paid and, since “this will undoubtedly preclude further shipments by you * * * any implied commitments made” during the July 26th meeting, “are withdrawn.” Thereafter, no further financing to plaintiff was made available to plaintiff by DLD.
(b) On the same day, Meriden wrote to QM stating, “this Company wishes to advise that no further deliveries will be made to the prime contractor on sockets, hinges and picks.” This letter further stated:
This action is being taken only after a visit to the RFC disclosed that that Agency would not make available additional financing for the prime contractor, except on an invoice discounting basis and the prime contractor has stated it has no other source of financing immediately available. The prime contractor has stated to us that he is unable to pay past due invoices and cannot meet payment of invoices on our credit terms. As a consequence, we have suspended shipments to the prime contractor, have notified him and are so notifying you.
(c) By letter of August 1, 1955, plaintiff’s heat treater advised it that “we are unable to resume heat treating intrenching tool components until your account is paid in full.” Its unpaid bills went back to March 1955.
(d) By letter of August 2,1955, plaintiff’s supplier of nuts *772 similarly advised QM that it would withhold future shipments unless its delinquent invoices were paid up in full.
With the above actions by RFC and plaintiff’s subcontractors, pl aintiff was no longer able to proceed with the performance of the contracts.
|113. (a) As had been arranged, on July 29, 1955, plaintiff did ship 10,000 tools to QM. This was the last shipment of tools made by plaintiff, bringing the final total number-of tools shipped by plaintiff on its three contracts to 520,260.
(b) DLD retained the full proceeds of the $19,430.55 payment by the Army for the 10,000 tools and applied it to the* RFC loans.
114. (a) After production commenced again in 1954 following the execution of Supplemental Agreements No. 2,, the number of completed tools that were finally rejected' by defendant even after initial rejections, screenings to-eliminate nonconforming tools, and reinspections) dropped drastically. Commencing March 8, 1954, when the first lot (Lot 22) from the new production after the shutdown was presented for inspection on contract 18702, through June 30,. 1955, when the last one (Lot 116) under this contract was submitted, plaintiff presented 95 lots for inspection and testing comprising 206,620 tools,[7] of which 201,560 were accepted. and only 4,660 rejected. Thus, final rejections represented-only approximately 2 percent of the number of tools inspected and tested. Of the 95 lots presented, only two (Lots-27 and 85) were ultimately rejected in their entireties.[8]
*773 (b) Similarly, commencing April 1, 1954, when the first lot was presented for inspection and testing on contract 18704, and extending through July 29, 1955, when the last lot (Lot 113) under this contract was submitted', plaintiff so presented 236,220 tools, of which 235,000 were accepted and •only 1,220 rejected. Thus, final rejections represented only approximately one-half of one percent of the number of tools inspected and tested. Of the 113 lots presented, none was •rejected in its entirety.[9]
(c) The decreased rejections reflected not only the results •of production under the changes provided for by Supplemental Agreement No. 2 (with its specification and drawing •corrections, as well as its less strict test requirements) but also more careful systems of internal inspections and control instituted by both Meriden and plaintiff and the weeding out of defective tools before they were presented to defendant for inspection and testing.
115. By letter of August 29, 1955, plaintiff advised the contracting officer that RFC had withheld over $14,000 “in funds due us which has seriously impaired our operations.” Plaintiff requested “an extension of time in order that we may develop other sources of working capital” and stated it was “anxious that the contracts remain in good standing.”
116. By letter of September 7,1955, the contracting officer stated he would afford plaintiff an opportunity “of furnishing concrete evidence of your ability to complete the performance of your contract if the same is extended” and that such data should be furnished as soon as possible.
117. (a) On September 9,1955, plaintiff filed, in the United States District Court, District of Massachusetts, Boston, Mass., a petition for reorganization under Chapter X of the Bankruptcy Act, pursuant to which a trustee was appointed for plaintiff.
On its 1955 operations up to September 9, plaintiff had total sales of only $456,839.04. Its civilian sales in its regu *774 lar heating equipment business had dwindled to $80,895.76. Thus, the bulk of its business consisted of the intrenching tool sales to defendant, amounting to $375,943.28. Its loss on its overall operations amounted to $125,961.65 and its deficit in working capital increased to over $293,000. Its current asset ratio had fallen to .31.
Thus, up to September 9, 1955, plaintiff had, since 1951, lost $699,006.82.
(b) As above noted, plaintiff was, during all of this 1951-1955 period, plagued by a lack of liquidity. Considering only its quick current assets (total cash and receivables but exclusive of inventories), the ratio thereof to its total current liabilities was as follows: In 1951 it had only $0.68 of quick assets to meet each $1 of current liabilities; in 1952, $0.53 ; in 1953, $0.39; in 1954, $0.23; and, as of September 9, 1955, $0.005.
The normal business standard for a sound cash position is approximately $1 of quick current assets for each $1 of current liabilities.
118. On October 13, 1955, the balance of the unpaid principal on plaintiff’s 1949 RFC loan was $134,162.34. On that date, this loan balance was consolidated with the balance due on the 1952 RFC loan.
119. On December 21, 1955, plaintiff’s trustee notified QM that plaintiff would not continue performance of the intrenching tool contracts.
120. On July 27, 1956, the District Court, no plan of reorganization having been filed, and the time for filing such a plan having expired, discharged the petition for reorganization.
121. (a) On December 20, 1956, the contracting officer wrote plaintiff concerning the two contracts which were still outstanding. As of February 29, 1956, which was the final date for the delivery of tools on contract 18702 under the last revised delivery schedule, plaintiff was in default to the extent of 99,994 undelivered tools. And as of March 31, 1956, which was such final date on contract 18704, plaintiff was in default to the extent of 127,000 undelivered tools, making a total default of 226,994 tools. The contracting officer noted that the RFC had taken possession of plaintiff’s plant and that:
*775 We have received no information from you which would evidence any intent to complete these contracts and, therefore, it is imperative that action be taken to dispose of these contracts in one way or another. Therefore, unless you advance valid reasons why these contracts should not be terminated for default pursuant to the “Default” Article thereof, namely, Article 11, General Provisions, within 10 days after receipt of this letter, termination action will ensue.
This letter constitutes a notice issued pursuant to Article 11(a) (ii) of the above mentioned contracts.
(b) Article 11(a) of the contracts provided as follows:
11. Default
(a) The Government may, * * * by written Notice of Default to the Contractor terminate the whole or any part of this contract in any one of the following circumstances :
(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or
(ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.
(c) On December 28, 1956, plaintiff’s attorney replied to the above letter, stating:
if; íjí ífc íjí í{«
The aforesaid Company had always intended to complete these contracts but, due to the arbitrary action of your Quartermaster Corps, the contracting company became incapacitated so to do, and was therefore forced into bankruptcy.
If you desire these contracts to be completed by Harvey-Whipple, Inc., please advise said Company or me of the terms upon which such completion would be consummated.
>122. (a) On January 80,1957, the contracting officer by a letter headed “Notice of Termination for Default,” terminated plaintiff’s right to proceed, with the delivery of the *776 ■undelivered balance of 99,994 tools under contract 18702 at the specified unit price of $1,945, totalling $194,488.33, reserving to defendant the right to procure the articles elsewhere and to assess any excess costs against plaintiff. The letter advised plaintiff of its right to appeal, under the disputes clause, the findings and decision set forth therein.
(b) On February 4,1957, a similar “Notice of Termination for Default” letter was sent to plaintiff with respect to contract 18704 and the 127,000 tools remaining undelivered at '■the same unit price, and totalling $247,015.
(c) By letter of March 2, 1957, to the Secretary of the Army, plaintiff appealed these terminations. Its letter further stated that “we are taking on our own behalf such steps in Congress as we feel will produce * * * recovery for ■all the damage Which has been caused” by defendant.
(d) On June 4, 1957, plaintiff filed its complaint on its ■administrative appeal, relying principally on the alleged •original erroneous drawings and specifications. Among •other things, plaintiff asserted “claims for damages from the Government for the losses sustained by reason of the actions ■of said Quartermaster Corps in a minimum amount of $738,438, being the amount by which a surplus of $421,898 was reduced to a deficit of $316,540, and losses due to the •closing of Complainant’s plant necessarily resulting from the foregoing actions of the Chicago Quartermaster Corps.”
123. On August 29, 1957, there was introduced in the House of Representatives, 85th Cong., 1st Sess., House Bill -H.B.. 9552, which read as follows:
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Harvey-Whipple, Incorporated, of Springfield, Massachusetts, the sum of $ . Such sum shall be in full satisfaction of all claims of the said Harvey-Whipple, Incorporated, against the United States for compensation for losses incurred by such corporation in connection with the manufacture by such corporation of entrenching tools pursuant to contracts which were entered into between such corporation and the Quartermaster Corps of the United States Army in May 1952, and which are *777 designated as DA 11-009-QM-18702, DA 11-009-QM-18703, and DA 11-009-QM-18704.
124. On October 24,1957, defendant filed a motion to dismiss plaintiff’s appeal on the grounds that all the matters complained of occurred prior to March 17,1955, the date of the execution of the releases contained in Modifications 8 and 6 to contracts 18702 and 18704, respectively (finding 107), and that therefore all “the grounds upon which the appellant has based its appeal were waived by the agreements of 17 March 1955.”
After plaintiff’s complaint was amended to allege that the agreements containing the releases were executed by plaintiff as a result of coercion, the matter came on for hearing on December 6,1957, before the Army Contract Appeals Panel of the Armed Services Board of Contract Appeals. No witnesses were presented, the hearing being restricted to argument by counsel on defendant’s motion. Plaintiff’s counsel (John S. Begley) was the same one who had represented plaintiff at the conference at QM on January 25,1955 (finding 104), and was one of the six representatives of plaintiff at the conference of March 9, 1955, at which the Memorandum of Understanding was agreed to (finding 106). During the course of the argument, defendant’s attorney stated that plaintiff originally “experienced trouble in producing an acceptable tool, in part because the specification needed some correction and in part also because of the failure of the component parts to meet the provisions of the specifications which were not questioned,” but that after “the specifications were clarified and corrected,” plaintiff “failed to produce acceptable tools at a satisfactory rate.”[10]
During his argument plaintiff’s attorney stated, on the economic duress or coercion issue relating to the releases, that “I told these people at the time that they should not sign them * * * ” but plaintiff’s officials went ahead and signed them anyway because they felt that the only alternative to proceeding on the proposed basis was to close down, *778 and that they “were just grasping at straws” which “must have been apparent to the Quartermaster Corps.”
125. On December 13,1957, the Armed Services Board of Contract Appeals handed down its decision. After stating that “the contractor experienced considerable difficulty in production due in part at least to faulty specifications,” it held that, unless they were reformed so as to eliminate the provisions containing the releases, Modifications 6 and 8 to the contracts foreclosed any recovery on plaintiff’s part because its claims were all in existence at the time they were ■executed. It further held, however, that it lacked the equity jurisdiction necessary to the taking of any such reformation action. Consequently, it granted defendant’s motion and dismissed the appeal.
126. On April 1, 1958, the House of Representatives, 85th Cong., 2d Sess., agreed to House Resolution 487, which read as follows:
Resolved, That the bill (H.R. 9552) entitled “A bill for the relief of Harvey-Whipple, Incorporated”, now pending in the House, together with all the accompanying papers, is hereby referred to the Court of Claims; and the court shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code and report to the House at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States and the amount, if any, legally or equitably due from the United States to the claimant.
127. (a) Plaintiff claims damages totalling $2,124,018.61. This amount represents plaintiff’s net worth as of December 31,1951, of $579,623.49; its debts as of September 9,1955 (the date it filed its petition under the Bankruptcy Act) of $758,213.09 (this includes all its debts relating to its heating business, including an account payable of over $123,000 to the Minneapolis-Honeywell Regulator Company) ; debts incurred after September 9, 1955, in the amount of $33,814 (consisting of real estate taxes on its plant from September 10, 1955, to March 21, 1958, the date RFC took over plaintiff’s plant on auction sale); the unpaid balance due on *779 t.be NFC loans in tbe amount of $156,578.03; and lost profits due to the loss of its business (from 1952 and projected through 1959), in the amount of $595,790.
(b) Plaintiff’s net worth as of December 31, 1951, was $579,623.49.
(c) Plaintiff’s admitted debts as of September 9, 1955, were $758,213.09.
(d) The real estate taxes incurred after September 9, 1955, to March 21, 1958, when NFC took over the plant, amounted to $30,140.40.
(e) The unpaid balance due on the NFC loans as of October 24,1958, was $156,578.03.
(f) As to the lost profits item, plaintiff claims that if it had not, commencing in 1952, been burdened by the three tool contracts, which, it contends, ultimately forced it out of business, it would have earned substantial profits in 1952 and the subsequent years. It claims these alleged lost profits for the eight years 1952-1959, which it contends would have amounted to $595,790.27. It derives this figure as follows:
It first calculates, on the basis of its 1942-1951 overall figures, its percent of profit to its sales. This figure is computed as 4.5123 percent. It then calculates the percent of the entire nation’s wholesale heating equipment business which was performed by plaintiff during such years. This figure is 1.8775 percent.
It then calculates the amount of business done by the entire industry during the years 1952-1959, applies 1.8775 percent thereto as the projected amount plaintiff would have obtained, and applies the profit figure of 4.5123 percent to such projected amount to give it an 8-year projected profit figure of $595,790.27. This is composed of annual profits in each of the 8 years ranging from approximately $63,500 to approximately $88,000.
Except for the war and immediate post-war years of 1945, 1946, and 1947, in which plaintiff’s profits were $158,506.81, $264,197.16, and $307,086.93, respectively, in no year prior to 1951 did plaintiff ever earn a profit as high as $63,500. Eliminating said three abnormal years, as well as 1948, during which plaintiff appears to have suffered an abnormal *780 loss of $106,804.92, plaintiff’s average profit for the six remaining years in the 1942-1951 period was only $17,512.[11]
At the time in 1952 that plaintiff entered into the tool contracts, it was already in an unsatisfactory financial position, with a poor credit rating. Between 1951 and 1955 its regular heating equipment business dropped drastically. The proof is not sufficient to relate this drop to the tool contracts. No production on the tool contracts occurred in 1952 and (although plaintiff did make some expenditures with respect to the tool contracts in 1952) financial matters relating to the tool contracts were not actually recorded in plaintiff’s books until 1953. Yet in 1952 plaintiff suffered a large loss of approximately $147,000, presumably resulting at least substantially from plaintiff’s regular heating equipment operations. Plaintiff’s overall unsatisfactory financial condition may have been aggravated ultimately to some extent by the tool contracts. However, even as to this, the evidence is unsatisfactory, since the record contains no satisfactory proof as to whether plaintiff made or lost money on the separate intrenching tool operation.[12] In any event, it is clear that a substantial part of the unsatisfactory and costly performance on the contracts was attributable to plaintiff’s and Meriden’s own faulty operations.
On the whole record, the proof is not sufficient to sustain plaintiff’s claim that, but for the tool contracts and defendant’s breaches of contract in connection therewith, plaintiff would have earned, in the 1952-1959 period, profits in the amount claimed, or in any amount.
128. (a) Since prior to the execution of the Supplemental Agreements No. 2, changing the drawings and specifications and correcting certain errors therein, plaintiff experienced so many rejections of completed tools, while with the resumption of production thereafter it experienced so few rejections, it is reasonable to assume that at least some of the rejections were due, at least in substantial part, to the defective specifications and drawings. As shown 'by findings *781 68(a) and 72, prior to the supplemental agreements 21,483 tools were rejected by defendant (even after re-screenings and re-testings). However, some rejections were due to factors for which defendant was not responsible too brittle steel). If it be considered that the defective specifications contributed substantially to tíre rejection of approximately 15,000 tools, which estimate appears reasonable, then, at the then applicable contract price of $1.8428 per tool (finding 55) plaintiff was damaged by such rejections to the extent of $27,642.
Mitigating such damage, however, was plaintiff’s disposition of a large number (38,001) of nonspecification tools in the civilian market at an average price of $0.63 per tool.[13] Therefore, on such 15,000 tools, plaintiff recouped $9,450. Accordingly, its net loss thereon was $18,192.
(b) Plaintiff suffered other damages attributable to the defective drawings. For a time, it did reforming work on the hinge in its own shop in order to achieve metal-to-metal contact. The record does not show the amount of such excess costs nor is it possible to make any kind of a reasonable estimate thereof.
(c) Plaintiff also suffered delays in the contract operations due to the defective drawings. The record does not show the amount of damages plaintiff suffered as a result of such delays nor is it possible to make any kind of a reasonable estimate thereof.
(d) As shown (finding 71), Supplemental Agreements No. 2 also allowed plaintiff increased compensation in connection therewith. The unit price of the tool was increased by over 11 cents ($0.11341). Under contract 18702, 201,560 tools were accepted by defendant after the execution of Supplemental Agreement No. 2, and 235,000 under contract 18704 (finding 114(a) (b)), making a total of 436,560 tools to which the additional compensation was applied, totalling $49,510.27. However, the record does not indicate the basis for the increased compensation provided by Supplemental Agreements No. 2 and what it was intended to cover. Further, these supplements preserved to plaintiff the right to *782 appeal to obtain additional compensation, but, although such an appeal was 'filed, it was never perfected or pursued.
DEFENDANT’S COUNTERCLAIM
129. Defendant has asserted a counterclaim for the unpaid balance of the indebtedness stemming from the RFC loans.. Subsequent to the dismissal of plaintiff’s petition for reorganization under Chapter X of the Bankruptcy Act, defendant instituted proceedings to foreclose the mortgages on plaintiff’s property. A judgment of foreclosure was entered’ on March 8, 1957, and sale thereunder was completed on March 21,1958. The proceeds of the sale were not sufficient to cover the indebtedness of plaintiff. As of October 24,. 1958, the amount of the deficiency was $156,578.03; interest has accrued from that date at the rate of $21,449 per day..
In addition to the foreclosure action taken by the Government against Harvey-Whipple, Inc., the Government has also> proceeded in the United States District Court for the District of Massachusetts against the individual guarantors of the* indebtedness, Walter O. Harvey and his wife, Edna R_ Harvey, Ray G. Whipple and his wife, Violet V. Whipple,, and Frank R. Swayne and his wife, Rita C. Swayne (Civil Action No. 58-933-S, filed on or about September 12,1958)., That court entered a judgment on or about May 5, 1961, in, the amount of $174,585.20, plus costs and interest. Execution on this judgment has been stayed pending determination of" this present action.

Actually, the agreement of the parties was, for administrative purposes, embodied in three contracts. This discussion will treat the three contracts as one contract.

 On August 29, 1957, H.R. 9552, entitled “A bill for the relief of Harvey-Whipple, Incorporated,” was introduced in the House of Representatives. (H.R. 9552 is contained in finding 123, infra.) On April 1, 1958, the House of Representatives passed House Resolution 487 which referred to the Court of Claims H.R. 9552. (H. Res. 487 is set out in finding 126, infra.) Authority for the reference is contained in 28 U.S.C. §§ 1492, 2509.
The petition in the instant case was filed on August 15, 1958, prior to the decision of the Supreme Court in Glidden Co. v. Zdanok, 370 U.S. 530 (1962). This court deems it proper to file this report without reference to the Supreme Court’s opinions in the latter case, and we reject defendant’s assertion of lack of jurisdiction.

 Actually, February 4, 1957, is tie date upon which the last of the three contracts was terminated.

 Tie nature anfl amount of damages claimed by plaintiff are described in finding 127, infra. Plaintiff seeks sucb items as tbe unpaid balance on tbe RFC loans and lost profits for tbe years 1952-59. Thus, plaintiff attempts to measure tbe damages resulting from tbe alleged breach of contract, at least in part, on tbe basis of events wbicb occurred subsequent to execution of the release (and subsequent to termination of the contract). However, the important fact, as explained above, is that the alleged liability-creating acts on the part of defendant occurred prior to the release.

 In Alloy Products Corp. v. United States, supra, the court rejected the plaintiff's assertion that a renegotiation agreement had been obtained through duress. The court noted, inter alia, that during the conferences which preceded execution of the agreement, Alloy Products had been represented by counsel. In the instant case, plaintiff’s attorney, Mr. Begley, was present during the negotiations regarding continuation of the contract (and the giving of a release). See findings 104 and 106, infra. See also finding 124, infra.

 Plaintiff, in its brief, points ont that, prior to referring this case, the Congress was aware of the release. According to plaintiff, this indicates that the release should not necessarily be binding “when the equities of the situation” are considered. A somewhat similar contention was made in the case of M. F. Comer Bridge and Foundation Co. v. United States, 147 Ct. Cl. 504, 178 F. Supp. 808 (1959). In the latter case, the plaintiff argued that the Senate bill which was referred to this court provided that this court ignore a release which had been signed by the plaintiff. This court stated, 147 Ct. Cl. at 509:
* * * We cannot read into S. 150 [the bill for the relief of the plaintiff] any such provision, and even though it had contained such a provision, it would have no force and effect in a court. * * *
*****
* * * In any event, it is for the court to determine whether or not plaintiff has an equitable claim and such determination must flow from the facts and not the wording of the pending legislation.

 Defendant, in its amended answer which was filed on June 3, 1959, asserted the violation of the covenant against contingent fees both as an affirmative defense and as the basis for a counterclaim. However, in its brief, the only counterclaim which defendant asserts is that regarding the RFC loans. This court interprets defendant’s actions as constituting a waiver of any counterclaim founded upon the contingent fee matter. This determination on our part should not be construed as an indication of our view regarding the question whether plaintiff’s agreement with Tucker did violate the contractual covenant. As stated above, we find it unnecessary to consider this question.

 In addition to the foreclosure action taken by the Government against Harvey-Whipple, Inc., the Government also proceeded in the united States District Court for the District of Massachusetts, 6 months after the sale of the property under foreclosure on March 21, 1958, against the individual guarantors of the indebtedness, Walter 0. Harvey and his wife, Edna R. Harvey, Ray G. Whipple and his wife, Violet V. Whipple, and Frank R. Swayne and his wife, Rita C. Swayne (Civil Action No. 58-933-S, filed on or about September 12, 1958). That court entered a judgment on or about May 5, 1961, in the amount of $174,585.20, plus costs and interest. Execution on this judgment has been stayed pending determination of this present action.
In argument before this court, plaintiff’s counsel pointed out that Harvey-Whipple, Inc., had been closed since the Government took over the plant, pursuant to foreclosure, and was insolvent.

 Actually, as of that date, the last six lots had not as yet been accepted. Considering plaintiff’s concrete situation at that time, 7,200 more tools would be considered as rejected. On that basis, only 8,000 tools were accepted and 15,800 rejected, or over 60 percent of the total number inspected.

 This contention is not sustained by the record. The only reguest by plaintiff in 1952 to go to R & D was in late December when plaintiff presented its second set of pre-production samples (findings 34-35), and this request did not relate to any alleged errors in the drawings or specifications. It was concerned only with a view of the laboratory’s testing techniques. The first mention of such errors (other than the size of the packing bos) was in February 1953, after Meriden had commenced production (finding 39). The first request for a 'meeting with It & D to discuss specification or drawing errors or ambiguities appears to have been made in May 1953 (finding 54(a)) which was after the Inspection Division had taken a position with respect to the blade-hinge metal-to-metal contact problem in late April 1953 (finding 49).

 The record fails to support this contention.

 The record also fails to support this contention. The revised production schedules were for the most part adoptions of plaintiff’s own requests and based upon plaintiff’s constant assurances that it would obtain additional sources of supply.

 Plaintiff did ship 50,000 tools that month.

 In calculating the new total contract prices, these modifications also in-, eluded payment by defendant for the tools subjected to the strength tests. By-previous supplemental agreements, it was provided that defendant would pay-$1.8173 per unit for such tools since, “based upon audit it has been determined» that the contractor’s cost per Intrenching Tool is $1.8173 per tool.”

 In all, plaintiff presented a total of 231,120 tools on tills contract. As. shown by finding 72, 23,800 had been presented in 1953 prior to Supplemental Agreement No. 2. Adding said 206,620 presented in 1954 and 1955 from resumed production makes a total of 230,420. The balance of 700 was pre- • sented as Lot 21 on December 15, 1953, and consisted of tools on hand and; remaining from 1953 production.

 Lot 27, consisting of 1,200 tools, was first rejected because three of the - five samples failed to pass the strength test, the wooden handle fracturing on one, the hinge at the base of the lobe fracturing on the second, and the blade • on the third. On the re-test (after the lot was entirely screened on an individual basis, and 60 tools eliminated) one of the five samples again failed due to hinge fracture. Thereupon a third (“umpire”) test was conducted on. ten further samples, but one of the ten failed, also due to hinge fracture.
Lot 85, consisting of 2,500 tools, was first rejected because, on the strength test, the wooden handle on one of the five samples fractured. On the re-test (after tbe lot was screened and 40 tools eliminated) two of the five samples. *773 f ailed because of fractured blades. There was no third (or umpire) test on this lot.
These two lots made up 3,700 of the total of 4,660 rejected on the 95 lots. The remaining 960 consisted of relatively small numbers screened out of ten lots initially rejected but subsequently accepted upon re-test.

 The 1,220 rejected tools consisted of relatively small numbers screened out of 17 lots initially rejected but subsequently accepted upon re-test.

 He also stated: “Tie purpose of the Supplemental Agreements was to make a number of changes in the specifications, some of which involved correction of errors in the original specification and others of which eased various test requirements.”

 For the years 1949 and 1950 (the last 2 years plaintiff made a profit), plaintiff's profit, based on net sales, was 2.25 percent.

 In Instances where defendant accepted at reduced prices tools with specification deviations on Meriden’s component parts, plaintiff charged back to Meriden the price redaction.

 A small number of nonspecification tools (442) were sold on individual bases at prices ranging from $2 to $3.95 per unit, for a total of $1.043.70.

 Means weekly dollar value of deliveries as required by the customer. Upon our acceptance of a contract or order originating either directly or indirectly through your efforts, we agree that you have earned your weekly salary in the corresponding columns, payment of which salary has no bearing with or relation to production, shipments or payment to us.